# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39629**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Steven L. NEWT**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 11 December 2020

———————————

*Military Judge:* Thomas J. Alford.

*Approved sentence:* Dishonorable discharge, confinement for 11 months and 29 days, and reduction to E-1. Sentence adjudged 27 October 2018 by GCM convened at Kadena Air Base, Japan.

*For Appellant:* Major David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and MEGINLEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Judge MEGINLEY joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Judge:

A general court-martial convicted Appellant, in accordance with his pleas and pursuant to a pretrial agreement, of two specifications of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ),

10 U.S.C. § 920.[1] Officer members sentenced Appellant to a dishonorable discharge, confinement for two years, and reduction to the grade of E-1. Consistent with the terms of the pretrial agreement and the military judge's granting of one day of pretrial confinement credit, the convening authority approved only 11 months and 29 days of confinement, along with the dishonorable discharge and reduction to the grade of E-1.

On appeal, Appellant raises three issues through counsel: that (1) the military judge erred in denying a defense challenge for cause of one of the members; (2) the military judge abused his discretion in denying Defense-requested sentencing instructions; and (3) the record is not substantially verbatim due to the military judge deciding contested issues during Rule for Courts-Martial (R.C.M.) 802 conferences. Appellant personally raises one additional issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): that the conditions of his post-trial confinement were inappropriately severe. We have carefully considered Appellant's claim regarding his confinement conditions, and we have determined it is without merit and warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable post-trial delay and whether the convening authority exceeded his authority by approving less confinement than specified in the pretrial agreement. Finding no error prejudicial to the substantial rights of Appellant, we affirm.

## I. BACKGROUND

Appellant joined the Air Force in November 2014 and arrived at his first permanent duty assignment, Kadena Air Base, Japan, with his wife and young son in June of 2015. Not long after, Appellant and his wife had their second son. In the fall of 2017, Appellant was assigned to be the sponsor for Airman (Amn) JS who was new to the Air Force, having just enlisted. Amn JS and his wife, Ms. BS, flew from St. Louis, Missouri, and arrived at Kadena's passenger terminal late in the evening of 6 October 2017 where they were met by Appellant who escorted them to their off-base hotel. The next morning, Appellant called one of his co-workers, Airman First Class (A1C) CK, to come over to his house and help move a grill. During that process, Appellant told A1C CK he had decided to have a barbeque at his house that evening and that he was inviting A1C CK and two other co-workers, along with Amn JS and Ms. BS. Appellant added that he thought Ms. BS was "hot."

---

[1] All references in this opinion to the Uniform Code of Military Justice and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

Later that day, Appellant picked up Amn JS and Ms. BS from their hotel and drove them to his on-base house. A1C CK and the other two co-workers arrived at some point, and—with the exception of A1C CK—the group of six all consumed alcohol and become noticeably intoxicated over the course of the evening. At some point during this time, Appellant told one of the other partygoers that he thought Ms. BS was "hot" and had "nice legs." Appellant encouraged the group to stay at his house due to their level of intoxication and brought an air mattress out into his living room.

In addition to drinking, Amn JS and Ms. BS were both jetlagged, having only slept a few hours the previous night, and Amn JS fell asleep at one end of the couch in Appellant's living room while the others stayed up playing a card game. Later on, one of Appellant's co-workers fell asleep on the floor, next to the mattress, and another fell asleep at the other end of the couch. Ms. BS fell asleep on top of Amn JS. Appellant's wife went to sleep in their bedroom with their children. A1C CK and Appellant, meanwhile, stayed up playing a video game in the living room, a few feet away from the couch and the air mattress. During the game, Appellant would periodically get up and get something to eat or drink, and A1C CK saw Appellant eventually sit down by the couch, close to Amn JS and Ms. BS.

A1C CK continued playing the video game by himself for a short time until he heard kissing noises behind him. Turning around to see what was going on, A1C CK saw that Ms. BS's shirt had been lifted to expose her abdomen, which Appellant was kissing while Ms. BS slept. A1C CK told Appellant to stop, which Appellant did, and A1C CK returned to the video game for a few minutes until he heard more kissing noises. When he turned around this time, he saw that Ms. BS's shorts were unbuttoned and unzipped, and Appellant had one of his hands down the front of her shorts and his other hand up her shirt, touching her breasts. A1C CK stood up and told Appellant to stop, to which Appellant responded, "This is my house. If you don't like it then get out."

A1C CK collected his belongings and walked out of the house. A few minutes later, Amn JS woke up to Appellant bumping his leg. Amn JS saw that Ms. BS was asleep and that her shorts and underwear had been pulled part way down her thighs such that her genitals were exposed. Her shirt was pulled up to just below her breasts, and Appellant had one hand up her shirt while he was touching her genital region with his other hand. Amn JS kicked Appellant off Ms. BS and then woke Ms. BS.

Amn JS verbally confronted Appellant, demanding to know what he had done, and Appellant claimed to not know what Amn JS was talking about, saying repeatedly, "I didn't do anything." When he testified at Appellant's trial, Amn JS agreed Appellant had asked him if he "really wanted to ruin [his] career over making an allegation like this" and that Appellant told him he was

"so f[**]king stupid" for accusing Appellant of assaulting Ms. BS. One of the other Airmen intervened to stop the escalating situation, and Amn JS and Ms. BS stepped outside where Amn JS was able to get the phone number for the base law enforcement desk from a neighbor. He called the number, and military law enforcement responded shortly after midnight, apprehending Appellant and placing him in confinement. Several hours later, while still in confinement, Appellant was given a breathalyzer test which measured his blood alcohol content to be 0.10 percent. At trial, the Defense's expert psychiatrist witness determined Appellant's blood alcohol content was likely in the 0.155 to 0.16 range at the time he was touching Ms. BS, a level the witness agreed made Appellant's conduct "somewhat surprising" given his "rather low" blood alcohol content.

Ms. BS underwent a sexual assault forensic examination which found Appellant's DNA on both of her breasts, her abdomen, her pubic mound, her anus, and on her underwear.

Throughout the investigation and his court-martial, Appellant maintained he had no recollection of much of the evening's events due to his consumption of a large amount of alcohol. Appellant had also taken his prescription antidepressant and anti-anxiety medications, one of which the Defense's expert psychiatrist witness characterized as a "minor stimulant."[2] Appellant said during the providency inquiry that he remembered his wife sitting next to Amn JS and Ms. BS after playing the card game, but that he had "no solid memory" from that point forward until his memory of sitting in jail in handcuffs. He told the military judge, "I think I have a memory of being pushed down and accused at some point, but it is too fuzzy to say for sure." He later clarified that he remembered "being accused of something by [Amn JS]" and "being pushed into the wall." Despite saying he did not recall assaulting Ms. BS, Appellant told the military judge he had no reason to believe he had not done so and he believed he was in control of his actions at the time.

Appellant pleaded guilty to two specifications of abusive sexual contact; the first was for touching Ms. BS's breasts, groin, and anus while he should have known she was sleeping; the second specification was for touching her abdomen. The military judge granted a defense motion to merge the two offenses for sentencing purposes, resulting in Appellant facing a maximum sentence of a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. Trial counsel asked the members to sentence Appellant to a dishonorable discharge, three years of confinement, and reduction to the grade of E-1. In his unsworn statement, Appellant asked

---

[2] The expert further testified this drug had been shown in studies to counteract the sedative and cognitive-dulling effects of alcohol to a degree.

the members to sentence him to a punitive discharge, and trial defense counsel echoed that request by recommending a bad-conduct discharge in lieu of confinement during the Defense's sentencing argument. The members sentenced Appellant to a dishonorable discharge, two years confinement, and reduction to the grade of E-1.

## II. DISCUSSION

### A. Challenge for Cause of Major CD

Appellant argues the military judge erred when he denied the Defense's challenge for cause of Major (Maj) CD, one of the court-martial members. Appellant had challenged Maj CD on a theory of implied bias because Maj CD said that he was "definitely on board" with military policies against sexual assault. On appeal, Appellant argues Maj CD's comments during voir dire "suggest he would sentence Appellant more harshly because of the policy that the military needs to be tougher on sexual assault." We conclude the military judge did not err.

#### 1. Additional Background

During group voir dire of the court-martial members, trial defense counsel asked if anyone had heard that the military has a "zero tolerance policy for sexual misconduct." All answered in the affirmative. Trial defense counsel then asked whether such a policy would lead the members to conclude they had an obligation "to be tough" in such cases or that a conviction of such an offense warranted a particular punishment. All answered in the negative on both accounts.

Each member was called back separately for individual voir dire, to include Maj CD. During that questioning, trial defense counsel asked Maj CD to elaborate on his awareness of such zero-tolerance policies, and Maj CD answered, "Definitely zero tolerance through commander's policy letters on the halls and multiple emails through—through my career." This led trial defense counsel to ask whether Maj CD had "any strong feelings" about such a policy, to which Maj CD responded: "No strong feelings. Just I'm definitely on board with it. . . . I support the policy letters that come down from base leadership." Trial defense counsel then asked if Maj CD supported policy letters from base leadership "as a matter of course." Maj CD said he did.

At the conclusion of trial defense counsel's questioning, the military judge told Maj CD, "Okay. And obviously, you know, we're in a hierarchical organization so things that come from the top down, it's smart to follow those things." The military judge then asked, "But putting that stuff aside, do you understand that your—if you are seated on this panel that your decision would be yours, and yours alone to make?" Maj CD said he did. The military judge followed up:

> I'm not aware of any policy that says you need to institute a particular punishment. But if there were a policy, do you understand you would have to put that aside and make the decision solely on the facts of the case and on the instructions on the law that I give you?

Maj CD again answered affirmatively and responded to further questions from the military judge by agreeing that he had not made up his mind at all about what punishment Appellant should receive and that he would give Appellant a full, fair, and impartial hearing.

Trial defense counsel challenged Maj CD, arguing they were concerned that Maj CD "was supportive of all policies coming down from the chain of command" and that he had "kind of [a] rogue reaction to follow directives from the top down" which would "raise[ ] questions from the outside looking in about his ability to be impartial." The military judge declined to grant the challenge, finding neither actual nor implied bias on Maj CD's part. The military judge explained Maj CD had stated he did not have strong feelings about the zero-tolerance policy. He continued:

> Zero tolerance was never specifically defined by the defense counsel: what it means, what the implications of that are, or the fact that we are actually in a sentencing proceeding and what does zero tolerance mean with respect to sentencing; that was never defined. So the fact that he said that he is supportive of a zero tolerance policy coming down from the Air Force does not raise an implied bias.

The military judge noted on the record he had considered the liberal-grant mandate. In addition to Maj CD, the Defense challenged three other members, and the military judge granted all three of those challenges—two of which were over the Government's objection. The Defense used its peremptory challenge to remove a fourth member, and Maj CD sat on Appellant's court-martial.

### 2. Law

"As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (footnote and citations omitted). Under R.C.M. 912(f)(1)(N), a member shall be excused for cause whenever it appears that member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality," and this rule encompasses implied bias, as well as actual bias. *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997). The United States Court of Appeals for the Armed Forces (CAAF) has explained that substantial doubt will be found when "the presence of a member on the panel would cause the public

6

to think 'that the accused received something less than a court of fair, impartial members,' injuring the public's perception of the fairness of the military justice system." *United States v. Commisso*, 76 M.J. 315, 323 (C.A.A.F. 2017) (quoting *United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008)).

In considering challenges for cause, military judges are obligated to liberally grant such challenges, and we review the judges' rulings for abuse of discretion. *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2001) (citation omitted). Although we give military judges a "high degree of deference" when reviewing actual-bias-based challenges, implied-bias challenges are analyzed "under a standard less deferential than abuse of discretion but more deferential than de novo." *Id.* (emphasis and citation omitted). Assertions of implied bias turn on the appearance of fairness through the eyes of the public, and such bias will be found when "most people in the same position would be prejudiced." *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998) (quoting *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996)). When conducting this analysis, we "assume the public to be familiar with the unique structure of the military justice system." *United States v. Hennis*, 79 M.J. 370, 385 (C.A.A.F. 2020) (quoting *United States v. Woods*, 74 M.J. 238, 243–44 (C.A.A.F. 2015)). The CAAF has determined that in the absence of actual bias, "implied bias should be invoked rarely," and instances in which a military judge's exercise of discretion is reversed on appeal will be rare so long as the military judge recognizes the liberal-grant mandate and places his reasoning on the record. *Wiesen*, 56 M.J. at 174 (citation omitted); *see also United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007). The burden of establishing the grounds for a challenge for cause is on the party making the challenge. R.C.M. 912(f)(3); *Daulton*, 45 M.J. at 217 (citation omitted).

**3. Analysis**

We are unconvinced the military judge abused his discretion in denying the defense challenge of Maj CD for cause. As an initial matter, we note that Appellant fails to explain how a military member's awareness of and support for a command policy of "zero tolerance" toward sexual assault—without more—could render a person unfit to serve as a court-martial member.[3] Abusive sexual contact, as charged in this case, is proscribed by the Uniform Code of Military Justice—which is to say the American citizenry, through its elected representatives in the United States Congress, has specifically criminalized the behavior. That military commanders have declared they have no tolerance for

---

[3] *See, e.g.*, *United States v. Simpson*, 58 M.J. 368, 375 (C.A.A.F. 2003) ("The implication of the phrase 'zero tolerance' to personnel in the military justice process depends on the training and experience of the person hearing the phrase, as well as the specific circumstances of a case.")

the commission of such criminal conduct is far from surprising—indeed, it would be far more unusual to learn of a commander concluding he or she would tolerate some amount of sexual misconduct. Similarly, there seems to be little noteworthy about Maj CD's explanation that he supported the policies issued by his leadership.

What is relevant here is not Maj CD's awareness or support of command policies regarding sexual assault-type offenses, but rather Maj CD's ability and willingness to set the command position aside, follow the military judge's instructions, and fairly and impartially assess Appellant's case. Maj CD assured the military judge he could and would do these things, and we see nothing in the record that would suggest he could or would not. Moreover, as the military judge pointed out, Maj CD was serving as a member on a panel charged not with assessing Appellant's guilt, but rather determining Appellant's sentence after Appellant's guilty plea. As a result, the issue of a "zero tolerance" policy becomes relevant only insofar as it would inform a court member's perspective on an appropriate sentence, and the existence of such a policy does not dictate a particular sentence, much less a harsh one. Theoretically, the concept of "zero tolerance" could suggest a service member convicted of such an offense should receive a punitive discharge such that he or she is not returned to the service, but that would require several logical steps not developed in this case. Moreover, Maj CD told the military judge he would make his decision based upon the facts of the case and the military judge's instructions, he would give Appellant a full, fair, and impartial hearing, and that he did not have any preconceived notion of what punishment Appellant should receive. The military judge both stated on the record he had considered the liberal-grant mandate and explained his rationale for denying the challenge. We see nothing irregular in the military judge's ruling on the Defense's challenge of Maj CD, and we conclude he did not abuse his discretion.

## B. Sentencing Instructions

Appellant asserts the military judge abused his discretion by denying the Defense's request for instructions on intoxication and certain other factors for the members to consider in their deliberations. We disagree.

### 1. Additional Background

Appellant's wife testified Appellant had struggled with alcohol abuse during his assignment to Kadena Air Base and that he eventually sought treatment, remaining sober for approximately six to eight months prior to the night of the barbeque. She testified she had never seen Appellant as drunk as he was that night, and the Defense hypothesized that one of Appellant's prescription medications might have kept Appellant from passing out, as his wife indicated

Appellant ordinarily would have done after consuming such a large amount of alcohol.

Trial defense counsel requested the military judge give the members the following instruction:

> Although the accused has been found guilty of the offenses charged and therefore mentally responsible, you should consider as a mitigating circumstance evidence tending to show that the accused was suffering from a mental condition as a mitigating factor tending to explain the accused's conduct. I refer specifically to matters including, but not limited to, depression, alcoholism, and involuntary intoxication.
>
> Alcoholism is recognized by the medical profession as a disease involving a compulsion toward intoxication. As a matter of law, however, intoxication from drinking as a result of the compulsion of alcoholism is regarded as voluntary intoxication. Alcoholism is not, in itself, a defense and the above instructions apply whether or not the accused was an alcoholic.
>
> Voluntary intoxication, whether by alcohol, prescription drugs or both, is not a defense to the Charge. However, evidence of voluntary intoxication may be a matter in mitigation and extenuation that is proper for you to consider.
>
> The law recognizes that a person's ordinary thought processes may be materially affected when he is under the influence of intoxicants. The inability to remember because of intoxication, sometimes called "alcoholic amnesia" or "blackouts" is not itself a defense. It is, however, one of the factors you should consider when deciding the extent and effect, if any, of the accused's intoxication.[4]

The Defense further asked the military judge to instruct the members to consider Appellant's age, good military character, family and domestic difficulties, military test scores, desire to remain in the service,[5] any expression by Appellant as to his desire to not receive a dishonorable discharge, and Appellant's mental condition or impairment at the time of the offense. Trial defense

---

[4] This instruction was derived, in part, from the voluntary intoxication defense instruction found in the *Military Judges' Benchbook* pertaining to specific-intent offenses. Dept. of the Army Pamphlet 27-9 at ¶ 5-12 (1 Sep. 2014).

[5] The Defense proposed this instruction prior to Appellant asking the members to sentence him to a punitive discharge.

counsel cited *United States v. Wheeler* as authority for instructing the members on these matters. 38 C.M.R. 72 (C.M.A. 1967).

The military judge declined both requests and instead instructed the members:

> In determining the sentence you should consider all the facts and circumstances, the offense of which the accused has been convicted, and all matters concerning the accused. Thus, you should consider the accused's background, his character, his service record, all matters in extenuation and mitigation, and any other evidence he presented. You should also consider any matters in aggravation. . . . While the accused's alcohol consumption and lawful prescription medication use may be a factor you consider in extenuation and/or mitigation, it is not a defense to this crime.

The military judge did not provide an extended explanation for his denial, simply noting that his instruction covered "at least some" of the Defense's requests.

### 2. Law

R.C.M. 1005(a) requires the military judge to "give the members appropriate instructions on sentence." We review a military judge's sentencing instructions for an abuse of discretion. *United States v. Hopkins*, 56 M.J. 393, 395 (C.A.A.F. 2002) (citing *United States v. Greaves*, 46 M.J. 133, 138 (C.A.A.F. 1997)). "The military judge has considerable discretion in tailoring instructions to the evidence and law." *Id.*

In evaluating whether a military judge erred by failing to give a requested instruction, we apply a three-prong test: (1) whether the proposed instruction is correct; (2) whether or not it is substantially covered in other instructions given by the military judge; and (3) whether it is "on such a vital point in the case that the failure to give it deprived [the appellant] of a defense or seriously impaired its effective presentation." *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1983) (citation omitted). This test has been applied by the CAAF in the context of sentencing instructions. *See, e.g.*, *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003).

### 3. Analysis

While Appellant's requested instruction regarding voluntary intoxication is arguably a correct statement that alcoholism is a disease and that alcohol abuse can cause memory problems, we are unconvinced the instruction is particularly relevant to Appellant's case or that it was otherwise appropriate in the context of Appellant's sentencing proceedings, much less that its omission

seriously impaired Appellant's sentencing case. The instruction proposed by trial defense counsel primarily sought to frame Appellant's intoxication—and his alcoholism more broadly—as a mitigating factor with respect to the offenses he committed upon Ms. BS insofar as it would "tend[ ] to explain" Appellant's conduct. Somewhat secondarily, the instruction would have told the members to consider Appellant's lack of recollection as a measure of the degree of his intoxication. Such considerations would be relevant to assess whether Appellant formed the requisite specific intent to assault Ms. BS. This assessment, however, would have only been pertinent to determining whether or not he was guilty of the allegations, a question which was not before the members. Appellant pleaded guilty and admitted to the military judge he had, in fact, formed the requisite specific intent to commit the offense of abusive sexual contact, and he formed that intent in spite of his intoxication. The issue before the members, rather, was what an appropriate sentence was for Appellant's offenses.

The evidence adduced at trial with respect to Appellant's intoxication and his history of alcohol problems was not disputed. There was no evidence, however, that Appellant had assaulted anyone during any of his prior drinking episodes or that Appellant's alcohol consumption would make it any more or less likely that he would assault Ms. BS the night of the barbecue. Appellant consistently claimed he had no memory of committing any offenses against Ms. BS, which—if true—is a measure of the level of his intoxication. Considering that Appellant conceded during his guilty plea his intoxication was no defense to his conduct, the degree of his intoxication would not have any obvious significance to the members' assessment of an appropriate sentence. Appellant would seemingly have us conclude that, as a matter of law, there is a proportional relationship between his degree of intoxication and the mitigating circumstances of his offenses. We find this position unavailing and decline to adopt it. The military judge instructed the members that Appellant's "alcohol consumption and lawful prescription medication use may be a factor [they could] consider in extenuation and/or mitigation," while reminding them that his intoxication was not a defense. The military judge's instruction accurately described the state of the law and appropriately advised the members they could consider his intoxication in arriving at an appropriate sentence. No more was required. The members were free to attribute whatever mitigating or aggravating value to Appellant's intoxication they deemed appropriate, but military judges are not to give undue emphasis to evidence favoring one party over the other. *See Damatta-Olivera*, 37 M.J. at 479 (citations omitted). We therefore conclude the military judge did not abuse his discretion in denying the Defense's proposed intoxication instruction.

The military judge told the members to consider Appellant's "background, his character, his service record, all matters in extenuation and mitigation,

and any other evidence he presented," but declined to specifically highlight other factors requested by Appellant: his age, military character, family and domestic difficulties, and his military test scores. The discussion under R.C.M. 1005(a) explains that "[i]nstructions should be tailored to the facts and circumstances of the individual case," and *Wheeler* stands for the proposition that military judges should "carefully . . . shape their instructions on the sentence to the evidence presented and to inform the court members fully as to their responsibilities." 38 C.M.R. at 76. But, in crafting sentencing instructions, military judges are not obligated to list "each and every possible mitigating factor for the court members to consider." *United States v. Hopkins*, 55 M.J. 546, 550 (A.F. Ct. Crim. App. 2001) (citation omitted), *aff'd*, 56 M.J. 393 (C.A.A.F. 2002). The instruction given by the military judge fairly included the matters the Defense requested be specifically highlighted by focusing the members on Appellant's service record and his background. The military judge did not abuse his discretion in declining to further advise the members to consider the specific factors requested by the Defense, matters which the Defense both placed in evidence and argued to the members.

## C. Substantially Verbatim Record

Appellant contends the military judge decided contested matters during off-the-record R.C.M. 802 conferences. Appellant specifically points to trial defense counsel's objection to the military judge permitting opening statements by the parties and the military judge receiving documents containing proposed sentencing instructions, documents which were not included in the record as exhibits.

### 1. Additional Background

During Appellant's court-martial, both parties provided opening statements to the members at the outset of the sentencing proceedings. The only discussion about this matter captured in the trial transcript came after trial counsel made a point about the Government's proposed timing of the publication of Prosecution Exhibit 1, the stipulation of fact, to the members. Trial defense counsel answered,

> Sir, our only position on that . . . the reason why we had objected to having an opening to begin with; and that was because they have Prosecution Exhibit 1, which is the roadmap and the outline. It presents the facts that they are about to hear and we thought that the opening was redundant and unnecessary and a waste of time of the members. But if—understanding your decision to give an opening, I don't believe that we are in a position to say that they can't review Prosecution Exhibit 1.

At a later point in the court-martial, prior to the Defense resting, the military judge addressed the Defense's motion to merge the two specifications for purposes of sentencing, ruling that he would grant the Defense's request. The military judge then said he would address how this ruling impacted the maximum sentence, which he noted was "a part of the instructions." He said, "[l]et me pull up your draft instructions," and went on to read the instruction pertaining to the maximum sentence he intended to give to the members, with which both parties agreed. Next, the military judge asked the parties whether they wished to be heard with respect to any special instructions or if he would just be "instructing on the standard instructions." Trial defense counsel began outlining the specific "*Wheeler* factors" he wished the military judge to advise the members of. After listing several factors, trial defense counsel said:

> I wouldn't request specific witnesses to lay out; just say, you know, "the testimony of all witnesses," or something along those lines. I know that the sample has testimony of blank, blank, blank. But we're just looking toward a general, overall thing. I am—and sir, my confusion is that a draft that has been going back and forth between [D]efense and the [G]overnment, I added some portions that I believe to be standard. So when you say standard, I'm not sure what you are looking at, so I'm just referring to what I've put in as tracked changes.

The military judge answered that he had "that highlighted document," and he said he assumed the highlighted portions were the Defense's recommendations. Trial defense counsel then said,

> I don't have access to the Internet, sir, so if it's the same document—I'm assuming it's the same document that I had sent to the [G]overnment last night. . . . So I'm getting a head nod from the [G]overnment that it's the same document I'm referring to; just in a different format.

After some more discussion about the instructions, the military judge said, "I will take the input from both sides but ultimately I'm responsible for the instructions. So I will circulate a copy of the instructions. You'll have an opportunity to object or request additional instructions." The military judge continued,

> I just wanted to make sure that there weren't any additional special instructions . . . in light of the fact that we haven't heard all of the testimony, so we will be revisiting instructions. . . . And I'm not making any ruling on [the request for *Wheeler* factors] at this time . . . .

Trial defense counsel then indicated he would be requesting a "specialty-type instruction" pertaining to intoxication, and the military judge said,

> So what I'm going to do for you there is you're going to have to propose some kind of language to me. I did not see that in the draft that was circulated. So if you have proposed language, please put that together. . . . and then just throw it in an email and send it to me this evening so I can consider that.

The next day, after all defense evidence had been presented, the military judge told the parties he did not have the opportunity to send out his instructions, but he wanted to discuss the Defense's requested instructions. The military judge then summarily denied the Defense's request for the intoxication instruction, and he told trial defense counsel, "[I]f you wish, you can have your instruction marked as an appellate exhibit and put into the record, to preserve that objection, or I can just read it into the record." Trial defense counsel opted for the latter, and the military judge read the instruction out loud so that it was captured in the trial transcript. After a few other matters were addressed, the military judge told the parties he would email them his "final draft instructions," that they should closely review, and that they could make any additional objections when they came back on the record. The court recessed for about half an hour, and when the court was called back to order, the military judge asked the parties if they had any additional requests for special instructions. Trial defense counsel and trial counsel both replied, "No, Your Honor."

At various points during the court-martial, the military judge summarized R.C.M. 802 conferences he had had with the parties, each time asking the parties if the summaries were accurate and if they had anything additional to add. Trial defense counsel never objected to or otherwise raised any concerns about the conferences.

**2. Law**

Under Article 39(a), UCMJ, 10 U.S.C. § 839(a), a military judge may call the court into session outside the presence of the members. Such proceedings are made part of the record. Article 39(b), UCMJ, 10 U.S.C. § 839(b). R.C.M. 802 authorizes military judges to conduct conferences with the parties "to consider such matters as will promote a fair and expeditious trial." R.C.M. 802(a). The purpose behind the conferences is "to inform the military judge of anticipated issues and to expeditiously resolve matters on which the parties can agree, not to litigate or decide contested issues." R.C.M. 802(a), Discussion. The conferences themselves are off-the-record, "but matters agreed upon at a conference shall be included in the record orally or in writing." R.C.M. 802(b). The failure to object at trial to the inclusion of matters from an R.C.M. 802 conference in the record waives the inclusion requirement. *Id.*; *see, e.g., United States*

*v. Allen*, No. ACM 38159, 2014 CCA LEXIS 216, at *35 n.10 (A.F. Ct. Crim. App. 28 Mar. 2014) (unpub. op.) (citation omitted) (failure to object to lack of conference summary waives issue).

A verbatim transcript must be included in the record of trial when a dishonorable discharge is adjudged. R.C.M. 1103(b)(2)(B)(i). A verbatim transcript contains "all proceedings including sidebar conferences." R.C.M. 1103(b)(2)(B), Discussion. Conferences held pursuant to R.C.M. 802 "need not be recorded, but matters agreed upon at such conferences must be included in the record." *Id.* Whether a record is "complete" and whether it is "verbatim" are two separate issues. *United States v. Gaskins*, 72 M.J. 225, 230 (C.A.A.F. 2013) (citation omitted).

In general, an "unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings." *United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018) (quoting *United States v. Lee*, 73 M.J. 166, 167 (C.A.A.F. 2014)) (additional citations omitted). When an appellant "intentionally waives a known right at trial, it is extinguished and may not be raised on appeal." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citation omitted). An appellant "may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995) (citations omitted). The requirement that a record of trial be both complete and substantially verbatim, however, "is one of jurisdictional proportion that cannot be waived." *United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F. 2014) (quoting *United States v. Henry*, 53 M.J. 108, 100 (C.A.A.F. 2000)).

### 3. Analysis

Appellant's initial position is essentially that the military judge improperly decided contested matters during unrecorded R.C.M. 802 conferences, as opposed to Article 39(a) sessions, which would have been transcribed as part of the trial transcript. From there he argues that any arguments or rulings occurring during the R.C.M. 802 conferences with respect to the opening statements and the sentencing instructions were omitted from the transcript, thereby rendering the transcript less than substantially verbatim. Having carefully considered Appellant's claim, we find it does not merit relief.

From a factual standpoint, we agree with Appellant that it appears there was some sort of off-the-record discussion between the military judge and the parties with respect to the issue of opening statements. We base this conclusion upon trial defense counsel's reference to "the reason why [they] had objected to having an opening to begin with." The substance of that discussion—whatever it was—is entirely absent from Appellant's record of trial. To the extent the military judge made a ruling about opening statements during an R.C.M. 802

conference, that should have been captured for the record. R.C.M. 802(b). That issue, however, was waived by Appellant by virtue of his failure to object at trial. *Id.*

With respect to the sentencing instructions, Appellant has failed to demonstrate there was any substantive discussion or ruling pertaining to the instructions in any R.C.M. 802 conferences. Instead, trial defense counsel indicated a draft set of instructions had "been going back and forth" between the Defense and the Government, and at some point a copy was provided to the military judge. Contrary to Appellant's suggestion on appeal, the transcript demonstrates the military judge discussed proposed instructions on the record during Article 39(a) sessions. Trial defense counsel did apparently email the military judge a proposed instruction on intoxication, but the military judge both ruled on that instruction on the record and read the text of the proposed instruction into the record. We find it difficult to conceive of a situation in which merely emailing draft instructions to the military judge amounts to litigating or deciding contested issues, and Appellant has not shown anything more than that occurred. By reading the proposed intoxication instruction into the record, the military judge preserved the text of Appellant's request, the same as if he had marked a paper copy of the instruction as an appellate exhibit. Significantly, the military judge gave the Defense the option of whether to capture the instruction verbally or by marking the written instruction, and trial defense counsel opted for the former. In any event, Appellant's lack of trial objection waived any alleged error with respect to including any R.C.M. 802 conference discussion about sentencing instructions in the record.

Appellant argues that—notwithstanding his waiver of the R.C.M. 802 requirement—R.C.M. 1103(b)(2) requires the inclusion of matters agreed upon at R.C.M. 802 conferences in the record. As an initial consideration, we note that the commentary about including such matters is found in the discussion to R.C.M. 1103, not in the text of the rule itself. That discussion explains a verbatim transcript includes "all proceedings," such as sidebar conferences, arguments, rulings, and instructions, as well as matters agreed upon in R.C.M. 802 conferences. We also note the title of R.C.M. 1103 is "[p]reparation of record of trial," falling within the "post-trial procedure" chapter of the Rules for Courts-Martial. The rule is focused on the important, yet largely ministerial, mechanics of assembling the record of trial—that is, what items are included in the record, who receives copies, when a verbatim transcript must be prepared, and so on.

Appellant invites us to conclude the discussion to R.C.M. 1103 operates to revive the same issue Appellant waived at trial under R.C.M. 802, giving him a second opportunity to raise the issue. We decline Appellant's invitation. R.C.M. 1103 addresses post-trial assembly of the record, whereas R.C.M. 802

16

addresses the conduct of portions of the trial proceedings. R.C.M. 802 explicitly permits the parties to waive the requirement that matters discussed in R.C.M. 802 conferences be captured in the record. It would make little sense that the discussion to a rule pertaining to the compilation of the record—which may occur weeks or months after a trial adjourns—would operate to overbear an explicit rule focused on in-court proceedings, which would be the appropriate time to lodge an objection as to any off-the-record conferences. Appellant's interpretation of the interplay between these two rules would read the R.C.M. 802(b) waiver provision out of the Rules for Courts-Martial, because the parties would never be able to waive the issue, as Appellant's theory would lead to the issue being revived by R.C.M. 1103 during the record's assembly, regardless of any waiver at trial. This, of course, would open the door to post-trial attacks on the nature and quality of the in-trial summaries of R.C.M. 802 conferences at a point in time where meaningfully remedying any shortcoming in those summaries would be difficult, if not impossible. We conclude an alternative interpretation makes more sense: the R.C.M. 1103 discussion calls for the inclusion of matters agreed upon during R.C.M. 802 conferences when such inclusion has not been waived by the lack of objection under R.C.M. 802(b). This reading preserves the waiver principle stated in R.C.M. 802 while placing the R.C.M. 1103 discussion in its proper context. By failing to object to the summary of the discussions held under R.C.M. 802 during his court-martial, Appellant waived this issue on appeal.

Even in the face of waiver, the Courts of Criminal Appeal are empowered under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to consider claims otherwise waived as part of our obligation to affirm only such findings and sentences which are correct in law and should be approved. *See United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016). Having considered Appellant's claim and the entire record, we will leave Appellant's waiver intact.

**D. Post-Trial Delay**

### 1. Additional Background

Appellant was sentenced on 27 October 2018, and the convening authority took action on 3 February 2019. Appellant's case was docketed with this court 23 days later, on 26 February 2019.

Appellant filed his assignments of error 11 months later, on 22 January 2020, after requesting and receiving 8 enlargements of time over government objection. The Government submitted a timely answer on 21 February 2020, without requesting an enlargement of time. Appellant submitted a reply to the Government's answer on 28 February 2020. Appellant has not made a demand for timely post-trial review or appeal.

### 2. Law

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, when the case is not docketed with the Court of Criminal Appeals within 30 days of action, and when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id*. at 136 (citing *Barker*, 407 U.S. at 533).

### 3. Analysis

This court did not issue its opinion within 18 months of docketing, exceeding the *Moreno* standard. Accordingly, we have considered the *Barker* factors to assess whether Appellant's due process right to timely review has been infringed.

The CAAF has held that where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration because Appellant's appeal has not resulted in any reduction in his term of confinement. Similarly, where the appeal does not result in a rehearing on findings or sentence, Appellant's ability to present a defense at a rehearing is not impaired. *Id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id*. Appellant has not asserted any particularized anxiety caused by delay in this case, and we discern none.

Just over 21 months have passed between the docketing of Appellant's case and the issuance of this court's opinion. More than half of the delay is attributable to Appellant's requests for enlargement of time in order to facilitate his filing of his assignments of error. By the time Appellant filed those assignments of error, nearly 11 months had elapsed from the date of docketing. The Government filed a timely answer, without requesting a delay, addressing the four issues Appellant raised on appeal. Moreover, this court is issuing its opinion just over three months beyond the 18-month *Moreno* standard. The record does not disclose any request by Appellant for timely review, and Appellant has not alleged he has suffered any prejudice by the delay. Considering the totality of the circumstances, we find no violation of Appellant's due process rights.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), we conclude it is not.

**E. Convening Authority's Action**

Although not raised by Appellant, we consider whether the convening authority exceeded his authority when he purported to approve a sentence less than the sentence provided for in the pretrial agreement in this case. Here, the pretrial agreement bound the convening authority to approve no confinement in excess of 12 months. Appellant was also entitled to one day of pretrial confinement credit as a result of the time he spent in custody after his arrest, a credit which the military judge specifically directed at the conclusion of Appellant's court-martial. *See United States v. Allen*, 17 M.J. 126, 127 (C.M.A. 1984). Following his staff judge advocate's advice to address this one day of credit in his action, the convening authority approved a sentence to confinement of 11 months and 29 days. The convening authority, however, was only authorized to alter Appellant's sentence to confinement "pursuant to the terms of the [pretrial] agreement." Article 60(c)(4)(C), UCMJ, 10 U.S.C. § 860(c)(4)(C). By attempting to reduce Appellant's confinement below the terms of the agreement—albeit for a single day and for the purpose of capturing the pretrial confinement credit—the convening authority exceeded his authority under the rules in effect at the time.

Rather than purport to approve a sentence which incorporated Appellant's pretrial confinement, the convening authority should have approved the sentence as limited by the pretrial agreement (*i.e.*, confinement for 12 months), and one day of credit would have then been applied against that sentence. Appellant has not alleged any prejudice with respect to this error, and we see none in the record. Nonetheless, the convening authority's approved sentence

is impermissible under Article 60, UCMJ, and we take corrective action by exercising our authority under Article 66(c), UCMJ, 10 U.S.C. § 66(c), to affirm such part of the sentence that should be approved. In doing so, we affirm only so much of the adjudged sentence that includes a dishonorable discharge, confinement for 11 months and 29 days, and reduction to the grade of E-1.

### III. CONCLUSION

The approved findings and sentence as we now affirm are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court