# United States Navy–Marine Corps Court of Criminal Appeals

Before
HOLIFIELD, BAKER, and HACKEL
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Nixon KEAGO**
Midshipman, U.S. Navy
*Appellant*

**No. 202100008**

_____

Decided: 5 July 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Ryan J. Stormer (arraignment, motions)
Aaron C. Rugh (trial)
Angela J. Tang (Entry of Judgment)

Sentence adjudged 14 August 2020 by a general court-martial convened at Washington Navy Yard, District of Columbia, consisting of officer members. Sentence approved by the convening authority: confinement for 25 years, forfeiture of all pay and allowances, and a dismissal.

For Appellant:
*Captain Marcus N. Fulton, JAGC, USN*
*Lieutenant Megan E. Horst, JAGC, USN*

For Appellee:
*Captain Tyler W. Blair, USMC*
*Lieutenant John L. Flynn, JAGC, USN*
*Lieutenant Gregory A. Rustico, JAGC, USN*

———————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————

PER CURIAM:

Appellant was convicted, contrary to his pleas, of one specification of attempted sexual assault, two specifications of sexual assault, four specifications of burglary, and one specification of obstructing justice in violation of Articles 80, 120, 129, and 131b, Uniform Code of Military Justice [UCMJ],[1] for actions involving fellow Midshipmen, both at the United States Naval Academy in 2018 and onboard a naval vessel in 2019.

Appellant asserts 10 assignments of error [AOEs], which we reorder and combine as follows: (1) the military judge erred by denying defense counsel's challenges to Lieutenant Commander [LCDR] Card,[2] LCDR Masters, Lieutenant [LT] Santero, and LT Rich for actual and implied bias; (2) Appellant's convictions for sexual assault and burglary involving Midshipman [MIDN] Sonntag, MIDN Morse, and MIDN Metcalf are legally and factually insufficient; (3) Appellant's sentence is inappropriately severe; (4) the military judge abused his discretion by admitting the testimony of MIDN Blunk, MIDN Kron, and Ms. Novack under Military Rule of Evidence [Mil. Rule of Evid.] 404(b); (5) the military judge abused his discretion by denying Appellant's motion to dismiss based on failure of law enforcement to prevent the loss of potentially useful evidence; and (6) Appellant, who is African American, was denied due process when the mostly Caucasian venire resulted in his being tried by a panel

———

[1] Articles 80, 129, and 131b, UCMJ, 10 U.S.C. §§ 880, 929, and 931b (2018) [UCMJ (2018)], and Articles 120 and 129, UCMJ, 10 U.S.C. §§ 920 (2012 and Supp. III 2016) and 929 (2012) [UCMJ (2012)].

[2] All names in this opinion, other than those of Appellant, the judges, and counsel are pseudonyms.

comprised of Caucasian and Asian members.[3] We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant, a Midshipman at the United States Naval Academy, was charged with crimes against three fellow Midshipmen.

### 1. Offenses against MIDN Sontag

In February 2018, MIDN Sontag returned to her dormitory room after a night out drinking with friends. Sometime later, she awoke to Appellant in her bed, naked, with an erect penis. Her shorts were partly pulled down, she felt pain in her vagina, and she knew that she had been penetrated. Midshipman Sontag confronted Appellant, who claimed that she had invited him. She told Appellant to leave, which he did after continuing to argue that he had been invited.

Midshipman Sontag immediately contacted a friend, MIDN Brown, and told her what had happened. During this conversation MIDN Sontag appeared frantic and was crying. Despite describing the assault to MIDN Brown, MIDN Sontag chose not to make a formal report at that time because she wanted to avoid any potential emotional trauma or damage to her military career if people found out what happened. She did, however, go to the hospital the following day for sexually transmitted disease and pregnancy testing.

Two days after the incident, Appellant emailed MIDN Sontag, provided his phone number, and asked if they could talk. (The two had no prior social or romantic relationship.) Midshipman Sontag met with Appellant and told him she did not want to discuss what happened and to stay away from her.

In September 2018, MIDN Sontag again awoke to find Appellant beside her in her bed, this time clothed, but again uninvited. Midshipman Sontag confronted Appellant and told him to leave. Appellant left after again claiming that she had invited him and that she did not remember because she was drunk. Approximately 30 minutes later, MIDN Sontag awoke to Appellant once more entering her room. She confronted Appellant again, telling him to

---

[3] Appellant personally raised several of these AOEs, in full or in part: (1) as it relates to LT Rich; (2) as it relates to MIDN Metcalf; and (4)-(6) in their entirety. *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed AOEs (4)-(6) and find them to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

leave and never come back. After this incident, Appellant emailed MIDN Sontag and apologized, claiming that he was drunk and had misunderstood her.

Midshipman Sontag did not immediately report the incident to law enforcement. But upon being interviewed during the investigation into Appellant's crimes against MIDN Metcalf, she reported Appellant's crimes against her.

### 2. Crimes against Midshipman Metcalf

Midshipman Metcalf knew Appellant because they were in the same company at the Naval Academy and he was her mentee's roommate. They were cordial, but not friends. The only emails between them were limited to official business.

In October 2018, MIDN Metcalf went out with a group of friends that did not include Appellant. After returning to her dormitory room and going to bed, MIDN Metcalf awoke to Appellant rubbing his penis against her clitoris and moving toward her vaginal canal. Midshipman Metcalf immediately pushed Appellant off of her and yelled at him. Appellant initially attempted to cover his face and stated his name was "Johnny." But when MIDN Metcalf identified him, Appellant claimed that MIDN Metcalf had told him to come into her room.

Midshipman Metcalf immediately left her room to seek help. She found MIDN Collin, who was standing watch, and reported that Appellant had sexually assaulted her. Midshipman Collin observed Appellant stick his head out of MIDN Metcalf's room, close the door, then reopen the door and exit the room. Midshipman Metcalf went to the hospital and underwent a sexual assault forensic exam. The nurse observed that MIDN Metcalf appeared traumatized, upset, and tearful.

### 3. Crimes against Midshipman Morse

In May 2019, MIDN Morse deployed on board a Naval Academy Yard Patrol Craft as part of a multi-ship training cruise to New York City for Fleet Week. While there, Appellant approached her at a bar and the two drank shots of alcohol together. Appellant and MIDN Morse were not in the same company at the Naval Academy and previously had only briefly communicated via Instagram. Upon leaving the bar, Appellant, MIDN Morse, and MIDN Lieber walked back to MIDN Morse's ship together. Appellant, who was assigned to a different ship, followed MIDN Morse onto her ship, at which point she asked another Midshipman to take Appellant back to his ship. No one witnessed Appellant leave MIDN Morse's ship, but a short time later he entered female berthing and stuck his head through the curtains of MIDN Morse's rack. MIDN Morse told Appellant to leave. She then heard the door to female berthing open and close.

Later that night, MIDN Morse awoke to Appellant in her rack. Appellant was pressing his body against MIDN Morse, kissing her neck, pulling her shorts off, and pressing his erect penis against her skin. MIDN Morse confronted Appellant and again told him to leave.

Thirty minutes later, Appellant returned a third time, awakening MIDN Morse. At this point MIDN Morse, after telling him to leave, texted the ship's group chat asking whomever was on watch to get Appellant out of female berthing.

Appellant returned a fourth and final time. Midshipman Morse again awoke to Appellant in her rack, pressing his body against hers and pressing his erect penis against her buttocks. Midshipman Morse left her berthing area, found a watchstander, MIDN Arness, and led him to Appellant, who was undressed and hiding in an empty rack. Midshipman Arness escorted Appellant back to his own ship.

Appellant later texted MIDN Morse, advising her not to say anything lest the two of them get in trouble for underage drinking.

### 4. Lost Video Footage

Prior to trial Appellant moved the Court to dismiss the charges against him relating to MIDN Morse due to the loss of material evidence. Specifically, Appellant argued that the loss of potentially useful surveillance video from the bar that MIDN Morse visited prior to Appellant assaulting her later that night was due to government bad faith.

During the course of the investigation, Special Agent [SA] Conway from the Naval Criminal Investigative Service met with the owner of the bar in an effort to recover any video evidence that may be relevant to the investigation. Special Agent Conway viewed the video footage from the night in question and identified a person she believed to be MIDN Morse, but was unsure due to the video's poor quality. Special Agent Conway testified that she was unable to identify any of the people MIDN Morse appeared to socialize with due to the poor quality of the footage. Although SA Conway documented her observation of the video in her investigative report, delays in following up allowed the video to be destroyed before it could be seized.

### 5. Similar, Uncharged Acts

The same month that Appellant assaulted MIDN Morse, he was caught entering a dormitory room at the Naval Academy in which three female Midshipmen were in their racks preparing to sleep. One of the Midshipmen, MIDN Blunk, heard the room's door open and called out to learn who had entered. Receiving no response, she used the light on her cell phone to sweep the room. She found Appellant standing in a corner. When she asked him what he was

doing, he did not answer, nor did he exit the room until MIDN Blunk twice demanded that he leave. Midshipman Blunk immediately reported the incident.

Ms. Novack, the mother of Appellant's child, described a similar event, also in 2019. Appellant and a female friend were staying at her apartment. As Ms. Novack and Appellant lay on a couch in the living room, the friend went upstairs to sleep in Ms. Novack's bedroom. A short time later, Appellant got up and looked intently down at Ms. Novack, who feigned sleep because she was curious to know what Appellant was doing. Through nearly-shut eyelids, she watched as Appellant left the room, looking back to see if Ms. Novack was asleep. After a few minutes, Ms. Novack went upstairs to her bedroom, where she found Appellant standing near the bed in which the friend slept. An argument ensued; Appellant confessed he had a "lapse in judgment."

## II. DISCUSSION

### A. The Military Judge did not abuse his discretion by denying Appellant's challenges of panel members LCDR Card, LCDR Masters, LT Santero, and LT Rich.

Courts generally recognize two forms of bias that subject a panel member to a challenge for cause: actual bias and implied bias.[4] "Actual bias is defined as 'bias in fact.'"[5] It is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."[6] "Actual bias is personal bias which will not yield to the military judge's instructions and the evidence presented at trial."[7]

"Whether a prospective juror 'is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the prospective juror's state of mind."[8] "[S]uch a finding is based upon determina-

---

[4] *United States v. Wood*, 299 U.S. 123, 133 (1936).

[5] *United States v. Woods*, 74 M.J. 238, 245 (C.A.A.F. 2015) (Stucky, J, concurring) (quoting *Wood*, 299 U.S. at 133).

[6] *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (internal quotation marks omitted) (citation omitted).

[7] *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted).

[8] *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (internal punctuation omitted).

tions of demeanor and credibility that are peculiarly within a trial judge's province."[9] "It is plainly a question of historical fact; did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."[10] "[T]he trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'"[11] We review actual bias-based challenges for an abuse of discretion.[12]

A military judge's resolution of challenges founded in implied bias receive slightly less deference. While we generally give a "military judge's ruling on a challenge for cause . . . great deference,"[13] we review rulings on challenges for implied bias "under a standard less deferential than abuse of discretion but more deferential than de novo."[14] This standard recognizes that implied bias deals with the public's objective perception of the fairness of the military justice system, and not simply the military judge's assessment of whether a challenged member can serve in a fair and impartial manner.[15] "[W]e evaluate implied bias objectively, through the eyes of the public, reviewing the perception or appearance of fairness of the military justice system."[16]

We will give greater deference where a military judge puts on the record his analysis and basis for denying a defense challenge for cause and indicates that he considered the liberal grant mandate.[17] "Although it is not required for a military judge to place his or her implied bias analysis on the record, doing so is highly favored and warrants increased deference from appellate courts."[18]

---

[9] *Wainwright,* 469 U.S. at 428.

[10] *Hennis*, 79 M.J. at 384 (internal citation and quotation omitted).

[11] *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citation omitted); *see United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (granting great deference to the military judge's ruling on challenges for cause).

[12] *Nash*, 71 M.J. at 88-89.

[13] *United States v. Rolle*, 53 M.J. 187, 191 (C.A.A.F. 2000) (citations and internal quotation marks omitted).

[14] *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002) (citations omitted).

[15] *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008).

[16] *United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008) (citations and internal quotation marks omitted).

[17] *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

[18] *Dockery*, 76 M.J. at 96.

This is because it provides a "vantage point of a military judge observing members in person and asking the critical questions that might fill any implied bias gaps left by counsel."[19] However, a mere "[i]ncantation of the legal test [for implied bias] without analysis is rarely sufficient in a close case."[20] We "afford a military judge less deference if an analysis of the implied bias challenge on the record is not provided."[21] In applying this standard, we look to the totality of the circumstances.[22]

"The test [for implied bias] takes into account, among other distinct military factors, the confidence appellate courts have that military members will be able to follow the instructions of military judges and thus, while it will often be possible to 'rehabilitate' a member on a possible question of actual bias, questions regarding the appearance of fairness may nonetheless remain."[23] The issue therefore is whether the risk that the public will think the accused received anything less than a fair trial is "too high."[24]

Further, the liberal grant mandate requires the military judge to err on the side of granting a defense challenge.[25] That is, "if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted."[26] This serves as a logical preventive measure because "it is at the preliminary stage of the proceedings that questions involving member selection are relatively easy to rapidly address and remedy."[27]

In this case, the defense challenged 14 members of the venire panel for cause. The military judge granted six defense challenges and denied the other eight. Of those eight, Appellant argues that the military judge erred in denying challenges of LCDR Card, LCDR Masters, LT Santero, and LT Rich, all of whom subsequently served as members of the court-martial.

---

[19] *Clay*, 64 M.J. at 277.

[20] *Unites States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015).

[21] *Id.* (citation omitted).

[22] *Nash*, 71 M.J. at 88.

[23] *Woods*, 74 M.J. at 243 (C.A.A.F. 2015).

[24] *Id.* (quoting *Townsend*, 65 M.J. at 463).

[25] *Peters*, 74 M.J. at 34 (citing *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998)).

[26] *Peters*, 74 M.J. at 34.

[27] *Id.* (citing *Clay*, 64 M.J. at 277).

Appellant challenged LCDR Card on the grounds of both actual and implied bias based on his strong beliefs about sexual assault in the military, comments he made regarding the presumption of innocence and an accused's right to remain silent, and the fact that his mother had once been kidnapped and nearly raped.

LCDR Card explained during voir dire that he volunteered as a Fleet mentor for the Naval Academy's Sexual Assault Prevention and Response [SAPR] program. His mentorship included issues related to building healthy relationships, fraternization, and consent, as well as sexual harassment and sexual assault.

On the member's questionnaire, LCDR Card answered affirmatively to questions asking if he wanted to hear from Appellant during the trial and whether Appellant should testify to prove his innocence. When questioned, LCDR Card explained that he took the question literally and answered that he would like to hear from Appellant. However, LCDR Card also explained that he understood that Appellant had no obligation to testify and that, while choosing to remain silent may be "a little self-defeating,"[28] he would not hold it against Appellant if the latter did not testify.

Regarding a comment that commands should "err on the side of believing" complaints of sexual assault, he explained that commands should take such allegations seriously and investigate. In other words, all criminal allegations should be investigated.

Lieutenant Commander Card also answered in the affirmative on the questionnaire when asked if he believed that the fact that Appellant had been charged with a crime meant there was some truth to the charges. When asked to explain, LCDR Card said that he believed that for charges to reach the trial stage, there must be more than an issue of "he said/she said" or a simple accusation and denial. He further clarified that he was not leaning one way or another regarding Appellant's guilt, but simply meant that any allegation at trial should be taken seriously. LCDR Card affirmed that he would wait until he had heard all the evidence before determining guilt or innocence.

LCDR Card explained during voir dire that his mother had been kidnapped and almost raped in 1975—before he was born. He described learning of it when his mother described it to him many years after the fact.

---

[28] R. at 848.

The military judge denied Appellant's challenges of LCDR Card for actual and implied bias.[29] The military judge provided his analysis on the record and found that the incident regarding LCDR Card's mother in 1975 was a non-issue in terms of his ability to serve as a panel member. The military judge noted that he observed no emotional reaction in LCDR Card's recitation of having learned about his mother's kidnapping. The military judge further found that LCDR Card's involvement as a Fleet mentor in the SAPR program was more about finding a way to be involved with students than it was related to the specific content of the program, and that LCDR Card had never been involved in the sexual assault prevention aspects of the program. The military judge also found that LCDR Card affirmatively stated that he would not hold Appellant's silence against him if he chose not to testify, and that LCDR Card's statement that something must have happened in order for the court-martial to take place was a literal answer and did not indicate he believed something illegal must have happened. The military judge denied the challenge while specifically considering the liberal grant mandate.

We conclude that the military judge's findings with respect to LCDR Card are not clearly erroneous. The military judge did not abuse his discretion in denying the challenge for either actual or implied bias, and we find LCDR Card's inclusion would not cause the public to perceive Appellant's panel as less than fair and impartial.

We have similarly reviewed the challenges to LCDR Masters, LT Santero, and LT Rich, and we similarly find that their responses during individual voir dire disproved any actual bias and dispelled any concerns about apparent bias. In each case, the military judge made specific findings clearly supported by the record and stated that he had considered the liberal grant mandate. Accordingly, we find this AOE to be without merit.

**B. Appellant's Convictions are Legally and Factually Sufficient.**

Appellant asserts the evidence is legally and factually insufficient to support his convictions. We review such questions de novo.[30]

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could

---

[29] R. at 1311.

[30] Article 66(d)(1), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

have found all the essential elements beyond a reasonable doubt."[31] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[32]

In evaluating factual sufficiency, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of the [appellant's] guilt beyond a reasonable doubt."[33] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[34] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[35]

### 1. Sexual Assault

Appellant was found guilty of sexually assaulting MIDN Sontag on or about February 2018, and MIDN Metcalf on or about 21 October 2018, in both instances by penetrating the vulva of the victim while he knew or reasonably should have known the victim was asleep.[36]

#### a. Sexual Assault of MIDN Sontag

In order to prove the offense as charged, the Government was required to prove that: (1) Appellant committed a sexual act upon MIDN Sontag by causing penetration, however slight, of the vulva by the penis; (2) MIDN Sontag was asleep; and (3) Appellant knew or reasonably should have known that MIDN Sontag was asleep.[37]

---

[31] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[32] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

[33] *Turner*, 25 M.J. at 325.

[34] *Washington*, 57 M.J. at 399.

[35] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[36] Appellant was charged with four specifications of sexual assault, alleging two theories of liability (bodily harm and asleep) for each incident. Appellant was found guilty of all four specifications, but the military judge conditionally dismissed the two charges of sexual assault by bodily harm.

[37] Art. 120, UCMJ (2012 and Supp. III 2016).

Midshipman Sontag testified that in February 2018, after a night out with friends, she returned to her dormitory room. She had been drinking, and her memory of the night was extremely hazy. Nonetheless, MIDN Sontag testified that she awoke to find Appellant in her rack beside her, naked, his penis erect. She also testified that her shorts were pulled down, she felt pain in her vagina, and she was certain she had been penetrated. Midshipman Sontag explained that she was confused and scared because she did not have any sort of relationship with Appellant. In fact, MIDN Sontag did not know Appellant's first name before this incident. When confronted, Appellant claimed that MIDN Sontag had invited him into her rack. While MIDN Sontag did not immediately report the assault to law enforcement, she did disclose it to her friend, MIDN Brown, and she went to the hospital the day after the assault for sexually transmitted disease and pregnancy testing. Finally, Appellant emailed MIDN Sontag the following day, asking her to meet and talk about what happened.

### b. Sexual Assault of MIDN Metcalf

In order to prove the offense as charged, the government was required to prove that: (1) Appellant committed a sexual act upon MIDN Metcalf, by causing penetration, however slight, of the vulva by the penis; (2) MIDN Metcalf was asleep; and (3) Appellant knew or reasonably should have known that MIDN Metcalf was asleep.[38]

Midshipman Metcalf testified that on the night of 21 October 2018, she had gone out with her friends. After getting back to her dormitory room that night, MIDN Metcalf went to sleep, alone and clothed. She awoke to Appellant on top of her in her rack, rubbing his penis against her clitoris and moving toward her vaginal canal. Midshipman Metcalf immediately pushed Appellant off of her and yelled at him. When MIDN Metcalf questioned Appellant about who he was, Appellant provided a false name. Appellant then claimed that MIDN Metcalf had invited him into her rack. After getting out of her rack, MIDN Metcalf recognized Appellant, though he was trying to cover his face. Midshipman Metcalf immediately reported the assault and underwent a sexual assault forensic examination.

### 2. Attempted Sexual Assault

Appellant was convicted of attempting to sexually assault MIDN Morse. In order to prove the offense as charged, the Government was required to prove that: (1) Appellant did a certain overt act; (2) the act was done with the specific

---

[38] Art. 120, UCMJ (2012).

intent to commit sexual assault of MIDN Morse, an offense under Art. 120, UCMJ; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the intended offense.[39]

Midshipman Morse testified she awoke to Appellant in her rack, pressing his body against her, kissing her neck, pulling her shorts off, and pressing his erect penis against her skin. She confronted him and told him to leave, yet she later awoke to Appellant again in her rack, pressing his body against hers and pressing his erect penis against her buttocks. Appellant's actions of entering MIDN Morse's berthing area and climbing into her rack constitute an overt act that amounted to more than mere preparation and tended to effect the commission of the offense had MIDN Morse not awoken and stopped him.

*3. Burglary.*

Appellant was charged with burglary in both 2018 and 2019.

*a. 2018 Offenses*

In order to prove the offenses as charged, the Government was required to prove that: (1) Appellant unlawfully broke and entered into the dormitory rooms of MIDN Sontag and MIDN Metcalf; (2) the breaking and entering occurred at nighttime; and (3) the breaking and entering was done with the intent to commit sexual assault, an offense punishable under Article 118 through Article 128, except Article 123a, UCMJ.[40]

Midshipman Sontag testified that in February 2018 Appellant entered her room during the nighttime without her permission. She further testified that he proceeded to sexually assault her in her rack until she awoke and made him stop. Appellant's actions of climbing into MIDN Sontag's rack and sexually assaulting her evidence his intent to commit the offense of sexual assault at the time of the breaking and entering.

Midshipman Sontag further testified that in September 2018, Appellant again entered her room during the nighttime without her permission. As discussed above, Appellant's actions of climbing into MIDN Sontag's rack evidence his intent to commit the offense of sexual assault, and that the breaking and entering was done with that intent.

Midshipman Metcalf testified that on or about 21 October 2018, Appellant entered her room during the nighttime without her permission. She further

---

[39] Art. 80, UCMJ (2018). See previous sections for discussion of the elements of sexual assault.

[40] Art. 129, UCMJ (2012).

testified that she awoke to Appellant sexually assaulting her in her rack. Appellant's actions of climbing into MIDN Metcalf's rack and sexually assaulting her evidence his intent to commit the offense of sexual assault when the breaking and entering was committed.

### b. *2019 Offense*

In order to prove the offense as charged, the Government was required to prove that: (1) Appellant unlawfully broke and entered the berthing area of MIDN Morse; (2) the breaking and entering were done with the intent to commit an offense punishable under the UCMJ; and (3) the breaking and entering were done with the intent to commit sexual assault, an offense punishable under Article 118-120, 120b-121, 122, 125-128a, or 130, UCMJ.[41]

Midshipman Morse testified that Appellant entered her berthing area onboard the ship without her permission. She further testified that she told Appellant to leave, but he returned multiple times. After returning, Appellant climbed into MIDN Morse's rack and attempted to sexually assault her while she was asleep, stopping only when MIDN Morse awoke and confronted him. Appellant's actions of attempting to sexually assault MIDN Morse evidence his intent to commit the offense of sexual assault when he unlawfully entered female berthing.

After weighing the evidence in the record of trial, and making every reasonable inference in favor of the prosecution, we are satisfied a reasonable factfinder could have found all of the essential elements of each charge and specification beyond a reasonable doubt. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt and find that the evidence is factually sufficient to support Appellant's convictions.[42]

## C. Appellant's Sentence is not Inappropriately Severe.

Appellant argues that his sentence of 25 years, total forfeitures, and a dismissal is inappropriately severe, particularly when compared to other cases involving sexual assault. We disagree.

---

[41] Art. 129, UCMJ (2018).

[42] We note that Appellant does not challenge the legal and factual sufficiency of his conviction for obstruction of justice. Nonetheless, we have reviewed the record and are satisfied that Appellant's conviction for this offense is legally and factually sufficient, as well.

We review sentence appropriateness de novo.[43] This Court may only affirm "the sentence, or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."[44] In exercising this function, we seek to ensure that "justice is done and that the accused gets the punishment he deserves."[45] The review requires an "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender."[46] We have significant discretion in determining sentence appropriateness, but may not engage in acts of clemency.[47]

We may consider other court-martial sentences when determining sentence appropriateness; however, we are only required "to engage in sentence comparison with *specific cases* . . . in those rare instances in which sentence appropriateness can be fairly determined *only* by reference to disparate sentences adjudged in closely related cases."[48] An appellant bears the burden of demonstrating that another case is "closely related" to his case and that the sentences are "highly disparate."[49] If the appellant meets that burden, then the government must show that there is a rational basis for the disparity.[50] But here we find Appellant, in referencing wholly unrelated cases and citing statistics related to sexual assault cases in general, has not met this burden.

In support of his claim that his sentence is inappropriately severe under the specific facts and circumstances of his case, Appellant points to the military judge's recommendation that the convening authority suspend up to 15 of the 25 years of confinement. The record indicates the convening authority properly

---

[43] *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006).

[44] Article 66(d)(1), UCMJ.

[45] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

[46] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted).

[47] *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

[48] *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001) (quoting *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999)) (emphasis in original).

[49] *Lacy*, 50 M.J. at 288.

[50] *Id.*

considered and declined the military judge's tersely explained recommendation.[51] A careful review of the entire record leads us to the same result.

A court-martial shall impose punishment that is sufficient, but not greater than necessary, to promote discipline and to maintain good order and discipline.[52] Among other factors, the sentence needs to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, promote adequate deterrence of misconduct, protect others from further crimes by the accused, and rehabilitate the accused.[53]

Here, Appellant was found guilty of committing two penetrative sexual assaults against sleeping fellow Midshipmen, an attempted sexual assault of another, four burglaries, and obstruction of justice. He faced a maximum punishment of 125 years. The evidence admitted at trial proved that he engaged in the repeated practice of entering the rooms of women at night with the intent of sexually assaulting them. He victimized multiple fellow midshipmen over the course of 15 months, repeatedly betraying the trust of his classmates, invading their private living spaces, and sexually assaulting them. In several instances he persisted in his actions despite being repeatedly told to stop and leave. Further, his crimes involving MIDN Morse occurred *while he was under investigation* for the crimes against MIDN Sontag and MIDN Metcalf.

As a result of his actions, Appellant's victims have variously suffered significant mental pain and anxiety, paranoia, insomnia, and alcoholism as they have struggled to live with what he did to them. Additionally, evidence presented during the sentencing portion of Appellant's trial showed Appellant to have low rehabilitative potential. These facts greatly outweigh Appellant's case in mitigation.

We find that Appellant's sentence was adjudged with individualized consideration based on both the nature and seriousness of his offenses, and Appellant's character. After reviewing the record as a whole, we find the sentence to be correct in law, that it appropriately reflects the matters in extenuation, mitigation, and aggravation presented, and that it should be approved.

---

[51] The military judge's justification for his significant recommendation simply reads: "In accordance with R.C.M. 1109 and after consideration of the evidence in aggravation, extenuation, and mitigation, the military judge recommends suspending up to but not more than 15 years' confinement for a period of 20 years." Statement of Trial Results at 1.

[52] R.C.M. 1002(f).

[53] R.C.M. 1002(f)(3)(A)-(F).

## III. Conclusion

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[54]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

KYLE D. MEEDER
Clerk of Court

---

[54] Articles 59 & 66, UCMJ.