UNITED STATES, Appellee,

v.

Ervin ROME, Jr., Private First Class,
U.S. Army, Appellant.

No. 96–1215.
Crim.App. No. 9500934.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 5, 1997.

Decided March 10, 1998.

Crawford, J., filed dissenting opinion.

For Appellant: *Captain Stephen P. Bell, Jr.* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Michael L. Walters,* and *Captain Norman R. Zamboni* (on brief); *Captain Michael E. Hatch.*

For Appellee: *Major Lyle D. Jentzer* (argued); *Colonel Joseph E. Ross* and *Lieutenant Colonel Frederic L. Borch* (on brief).

## Opinion of the Court

GIERKE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted robbery in violation of Article 80, Uniform Code of Military Justice, 10 USC § 880. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 2 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence without opinion. Our Court specified the following issue:

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING DEFENSE COUNSEL'S CHALLENGE FOR CAUSE OF LIEUTENANT COLONEL M.

We hold that the military judge abused his discretion.

## Factual Background

The voir dire of Lieutenant Colonel (LTC) M focused on four areas: (1) his supervisory relationship with an enlisted member of the panel; (2) his professional relationship with trial counsel; (3) his relationship with Special Agent (SA) Wallace, a prosecution witness; and (4) his involvement in unlawful command influence in another case where the issue was raised by appellant's trial defense counsel. Defense counsel also explored LTC M's exposure to media coverage of the offenses before the court-martial, but no basis for challenge was developed because LTC M's recollection of media coverage was vague and unspecific.

During initial voir dire by the military judge, LTC M disclosed that he was the battalion commander of Staff Sergeant (SSG) HM, a member of the panel, and as such he was required to evaluate SSG HM's duty performance. SSG HM assured the military judge that he would not feel inhibited or restrained by LTC M's presence on the panel. Likewise, LTC M assured the military judge that he would not be embarrassed or restrained if SSG HM disagreed with him.

LTC M also disclosed that trial counsel provided legal support to his battalion. He assured the military judge that he would not give more weight to trial counsel's arguments because of their professional relationship.

LTC M disclosed that he knew a prosecution witness, SA Wallace, because of "several dealings quite some time ago with CID investigations." He also disclosed that his daughter baby-sat SA Wallace's children. On further questioning by the military judge, LTC M said that his relationship with SA Wallace was "just professional" and "nothing social."

After both sides had completed their initial voir dire, the military judge *sua sponte* disclosed that in a previous case involving a Private First Class (PFC) Looney, he had "ma[d]e the determination in that case [LTC M] did some things he shouldn't have done." The military judge explained:

Specifically, I felt that he had engaged in some unlawful command influence, not intentionally, but that was the result of his actions. Specifically, I ruled that he had

crossed the line in counseling or talking to some NCOs who had written statements on behalf of the accused in that case, which led to him being released from pretrial confinement....

The military judge commented that LTC M "got kind of grilled during that previous court-martial" and offered counsel an opportunity to inquire further. Defense counsel disclosed that she was the defense counsel who raised the issue and "grilled" LTC M in the previous case. Defense counsel stated that she was "not really concerned that [the military judge] found unlawful command influence" but was concerned that she had raised the issue and caused trouble for LTC M in a high-profile case with media attention.

On further voir dire by trial counsel, LTC M stated that he knew defense counsel "only from courts-martial," and he opined that in the other case she "did a good job, in my opinion, of supporting her client." He asserted that his experience in the previous court-martial would not affect his ability to impartially sit as a court member.

No further information about the previous court-martial was developed on the record. Defense counsel's challenge of LTC M for cause was denied. Defense counsel then challenged LTC M peremptorily and preserved the issue by announcing that she would have exercised the peremptory challenge against another member if the challenge for cause had been granted. *See* RCM 912(f)(4), Manual for Courts–Martial, United States (1995 ed.).

## Discussion

RCM 912(f)(1)(N) provides that a court member "shall be excused for cause whenever it appears that the member ... [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." Recognizing that the convening authority appoints the members of the court-martial and each party has only a single peremptory challenge, this Court has enjoined military judges to be liberal in granting challenges for cause. *United States v. Smart*, 21 MJ 15, 21 (CMA 1985).

RCM 912 includes both actual bias and implied bias. *United States v. Harris*, 13 MJ 288, 292 (CMA 1982). A military judge receives "great deference" from appellate courts on issues of actual bias. *United States v. White*, 36 MJ 284, 287 (CMA 1993). The judge receives less deference on implied bias. *United States v. Napoleon*, 46 MJ 279, 283 (1997). Implied bias is viewed through the eyes of the public, focusing on the appearance of fairness. *United States v. Dale*, 42 MJ 384, 386 (1995). Implied bias exists when "most people in the same position would be prejudiced." *United States v. Daulton*, 45 MJ 212, 217 (1996). In *United States v. Lavender*, 46 MJ 485, 489 (1997), we recognized that implied bias should be invoked rarely.

In the case before us, LTC M's professional relationship with SA Wallace was not *per se* disqualifying. *United States v. Napoleon, supra*. Likewise, his professional relationship with the trial counsel was not *per se* disqualifying. *United States v. Hamilton*, 41 MJ 22 (CMA 1994). Finally, his place in SSG HM's rating chain was not *per se* disqualifying. *United States v. Murphy*, 26 MJ 454, 456 (CMA 1988).

LTC M's role in the trial of PFC Looney is more troublesome. LTC M disclaimed any animosity toward defense counsel, and he opined that she had done a good job for her client. Nevertheless, defense counsel had "grilled" LTC M and obtained a ruling that was personally and professionally embarrassing to LTC M in a high-profile case.

We hold that the military judge erred by not granting the challenge for implied bias. In the eyes of the public, the appearance of fairness would have been compromised by allowing LTC M to sit after being personally and professionally embarrassed by appellant's defense counsel. This was a situation where "most people in the same situation would be prejudiced." *Daulton*, 45 MJ at 217.

Furthermore, even if the exposure of LTC M's unlawful command influence by trial defense counsel in PFC Looney's case

was not sufficient by itself to support an implied-bias challenge, the combination of that incident and LTC M's relationships with a government witness, the trial counsel, and an enlisted member of the panel created the rare occasion where the implied-bias doctrine should have been invoked, because it would have raised substantial doubt about the fairness and impartiality of the proceedings if LTC M had remained on the panel. Allowing LTC M to sit would have been "asking too much of both him and the system." *Dale*, 42 MJ at 386. Accordingly, we hold that the military judge abused his discretion by not granting the challenge for cause against LTC M.

### Decision

The decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge COX and Judges SULLIVAN and EFFRON concur.

CRAWFORD, Judge (dissenting):

Military judges, like their civilian counterparts, are entitled to deference from the appellate courts when ruling on the question of challenges for cause.

The question of "partiality" of a court member is "plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). Consequently, "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'" *Id.* at 1038, 104 S.Ct. at 2892. This "determination is essentially one of credibility, and therefore largely one of demeanor" that should be determined by the trial judge. *Id.* Judges are in the best position to evaluate both the verbal and non-verbal communication, including the raised eyebrow, the hesitancy, and

movement as to whether the court member is being honest during *voir dire*. The judge in this case recognized that he had to make the credibility decision.

*United States v. Minyard*, 46 MJ 229, 234 (1997)(Crawford, J., dissenting). In this instance, the judge was in the best position to determine, based upon his observations in the prior case as well as this one, whether a challenge for cause was justified.

The other case mentioned by the judge is *Looney*, 9500433 (Army Ct.Crim.App.). In that case, the same judge as in appellant's case ordered Looney released from pretrial confinement, even though Looney had been charged with murdering his roommate by piercing his heart with a pocket knife. LTC M, a member in appellant's case, was not happy that Looney had been released from pretrial confinement. He complained to the non-commissioned officers (NCOs) who served as Looney's character witnesses in support of Looney's release from confinement. His actions were challenged as unlawful command influence by defense counsel for Looney, who was also trial defense counsel for appellant. The military judge, to remedy any impact that LTC M's action might have had, allowed the defense to call as many character witnesses as it wanted but refused to allow the Government to cross-examine these witnesses or call its own character witnesses in rebuttal. This remedy applied to the merits of the case and to sentencing. Looney was found guilty of murder under Article 118(3), UCMJ, 10 USC § 918(3), and was sentenced to a dishonorable discharge, 10 years' confinement, total forfeitures, and reduction to the lowest enlisted grade.

LTC M served as a court-member in appellant's trial after extensive *voir dire*. He testified under oath that he could decide appellant's case based on the evidence and would not hold the defense counsel's actions in the *Looney* case against her. When asked about defense counsel in the *Looney* case, LTC M stated, "I know her only from courts-martial, not outside of that. She did a good job, in my opinion, of supporting her client." LTC M indicated that his dealings with the

*Looney* case would not affect his ability to be impartial and fair in appellant's case. The same military judge who found that LTC M exercised unlawful command influence in the *Looney* case observed LTC M's demeanor, listened to his testimony, and found him credible and able to sit as an impartial member at appellant's court-martial. The military judge's decision was not a "clear abuse of discretion." *United States v. White*, 36 MJ 284, 287 (CMA 1993).

While the majority denies invoking the theory of implied bias to establish *per se* rules for challenges for cause, the result of its recent decisions appears to do just that. In this case, the majority focuses on LTC M, who was "grilled" by defense counsel and "personally and professionally embarrass[ed]" in the *Looney* case. 47 MJ at 469.

In effect, the majority applies the liberal-grant mandate at the appellate level rather than at the trial level. While we have indicated that the implied-bias rule is to be rarely invoked, this Court has frequently applied the rule to set aside convictions in the last two terms. While at first blush the majority action may appear to be laudible in terms of public perception, it raises serious questions about the standards to be employed in the military justice system. Certainly, undermining these standards does not enhance public perception or confidence in the military justice system. Invocation of the doctrine of implied bias should be a rare exception when a "juror is an actual employee of the prosecuting agency, [when] the juror is a close relative of one of the participants in the trial or the criminal transaction, or [when] the juror was a witness or somehow involved in the criminal transaction." *Smith v. Phillips*, 455 U.S. 209, 222, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring).

Admittedly, there are differences between courts-martial with court members and jury trials with civilian jurors. These differences include the purpose of the military justice system, the type of individuals selected to be court members pursuant to Article 25(d)(2), UCMJ, 10 USC § 825(d)(2), and the protection given to general verdicts. *See, e.g., United States v. Hardy*, 46 MJ 67 (1997). Selection of court members "by reason of age, education, training, experience, length of service, and judicial temperament" differs significantly from random selection of civilian jurors by voter-registration or driver's-license lists. Art. 25(d)(2). A military panel of court members has often been called a "blue ribbon" panel due to the quality of its members. *See* Jesse Birnbaum, *A New Breed of Brass: From the Ashes of Vietnam, the Pentagon Has Shaped a Sophisticated Military that Speaks Well and Fights Smart*, 1991 WL 3118757, Time Magazine 58 (March 11, 1991); David Gergen, *Bringing Home the "Storm"; What the Victorious American Military Could Teach the Rest of Us*, 1991 WL 2142956, Washington Post (April 28, 1991). Arguably, this difference is such that invocation of the doctrine of implied bias should be even rarer in the military.

*United States v. Youngblood*, 47 MJ 338, 346 (1997)(Crawford, J., dissenting).

But if the doctrine does apply, what are the parameters of the majority's implied-bias rule? How is it to be applied by the trial judge? I suggest that the majority's invocation of the implied-bias theory is too vague to be workable. *Compare United States v. Dale*, 42 MJ 384 (1995), *with United States v. Fulton*, 44 MJ 100 (1996); *compare United States v. Minyard*, 46 MJ 229 (1997), *with United States v. Lavender*, 46 MJ 485 (1997).

In *Dale*, the majority held that a captain who supervised misdemeanor and other non-felony investigators, i.e.—"non-OSI (Office of Special Investigations) investigations," could not sit as a panel member under an implied bias theory. This captain supervised the security work force, such as traffic officers and gateguards. He also sat in on presentations of disciplinary statistics called the "cops and robbers" meeting, the purpose of which was to "brief the base commander in those areas."

However, in contrast, this Court held in *Fulton* that a major was not disqualified as a member, even though he was the Chief of

Security Police Operations for the Pacific Air Forces, had both a bachelor's and master's degree in criminal justice, had been a security policeman, and had been the victim of a burglary and larceny.

In *Minyard,* this Court held that it was reversible error not to sustain a challenge for cause against Major B. The defense argued that Major B was the "wife of one of the case agents or the assistant case agent." Not surprisingly, she testified under oath that her husband, who was an investigator on a major installation, had said over the phone, "More money?" When she asked her husband about the comment, he said it was a case he was working on but did not identify the case or the individual involved. Her husband did not testify at the Article 32[1] and did not testify at trial.

The relationship of Major B's husband to the *Minyard* case was based only upon argument by counsel and the off-handed comment about "more money" while her husband was on the phone. Major B testified under oath that she had no association with the case, no professional association with the OSI, had heard no details of the case, did not know that her husband was involved with a case, and had not formed an opinion on the outcome of the case. In addition, the appellant in *Minyard* readily admitted having used his roommate's ATM card. The only issue was whether appellant had permission from his roommate. Even so, the majority of this Court held that there was a clear abuse of discretion in not sustaining the challenge for cause.

A subjective "I know it when I see it" approach to the theory of implied bias by appellate courts can lead to inconsistent results, which leaves the bench and bar without clear guidelines. An example of this can be seen in a comparison of the majority's rationale in *Minyard* with its rationale in *Lavender.* In *Lavender,* money was taken from the purse of one of the panel members, Major P, during a recess. The panel consisted of six officers and six enlisted members. Major P informed the president of the panel in the presence of the others. While Major P said that she could sit on the case, she was excused by the military judge after a challenge for cause. The president of the panel also volunteered that he thought Captain S was emotionally affected by the incident. The judge granted a challenge against her as well. This Court, in effect, held that the implied-bias doctrine was not applicable because the public would not be concerned with the other members remaining on the panel.

In reaching its conclusion in all of these cases, the majority applied a subjective, public perception rule. Admittedly, few accused would want to be judged by a court member who was appointed by the person who forwarded charges to trial and, in the event of a guilty verdict, who would also decide whether to approve the findings and sentence. Taken to its logical conclusion, under the majority's expansive test, no servicemember could sit as a court member at a court-martial because all court members are appointed by the convening authority.

This Court must always remember that the military criminal justice system is a worldwide system of justice administered by the armed forces and responsible to civilian authority. Commanders are entrusted with the mission of carrying out the civilian leadership's direction to assure that this country remains a super-power and maintains a strong national defense. In order to do so, commanders must ensure that servicemembers are responsive to orders. Discipline is an integral part of this mission. Commanders and senior NCOs are responsible for maintaining discipline, and they should be trained on how to do so.

Viewing the majority's invocation of the implied bias theory in this and other cases in a broader context, one must now question whether commanders and senior NCOs can ever serve as court members. Even the random selection of court members would not resolve this matter to the majority's satisfaction. It has become most difficult to predict the alpha and omega of the majority's implied-bias theory. If the majority continues to apply the doctrine of implied bias in this manner, they will, I fear, further confuse

1. UCMJ, 10 USC § 832.

the field and erode confidence in the appellate process.