*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HOLIFIELD, KIRKBY, and DALY
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Edmond A. MAEBANE III**
Hospital Corpsman Second Class Petty Officer
(E-5), U.S. Navy
*Appellant*

**No. 202200228**

_____

Decided: 3 May 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Stephen F. Keane

Sentence adjudged 16 June 2022 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, confinement for six years, forfeiture of all pay and allowances, and a dishonorable discharge.

For Appellant:
*Lieutenant Zoe R. Danielczyk, JAGC, USN*
*Lieutenant Colonel Matthew E. Neely, USMC (argued)*
*Donald C. King*

For Appellee:
*Lieutenant Commander James P. Wu Zhu, JAGC, USN*
*Lieutenant Commander Paul S. LaPlante, JAGC, USN (argued)*

Chief Judge HOLIFIELD delivered the opinion of the Court, in which Senior Judge KIRKBY and Judge DALY joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

HOLIFIELD, Chief Judge:

A panel of officer and enlisted members at a general court-martial convicted Appellant, contrary to his pleas, of one specification of reckless endangerment and one specification of involuntary manslaughter, in violation of Articles 114 and 119, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts seven assignments of error [AOEs]: (1) Appellant's Sixth Amendment right to present a complete defense was violated when the military judge excluded evidence of a third party's confession to the allegations against Appellant; (2) the military judge erroneously failed to excuse a member for implied bias when the member used the facts of this case as a "teaching moment" and expressed an "innate" adverse reflex to others' improper handling of weapons; (3) the convening authority became an accuser by directing an Article 32, UCMJ, preliminary hearing into Appellant's alleged offenses when preferred charges against Appellant did not exist; (4) the military judge erroneously denied trial defense counsel's continuance request that was necessary to ensure a defense expert consultant was present at trial; (5) the evidence is legally and factually insufficient to support a conviction for the additional charge of reckless endangerment in violation of Article 114(a), UCMJ; (6) the

---

[1] 10 U.S.C. §§ 914 and 919.

evidence is factually insufficient to support a conviction for involuntary manslaughter in violation of Article 119, UCMJ;[2] and (7) Appellant was entitled to a unanimous verdict. We find no prejudicial error and affirm.[3]

# I. BACKGROUND

## A. The Shooting and its Immediate Aftermath

On the evening of 16 August 2019, Appellant hosted a gathering at his residence on Marine Corps Air Ground Combat Center, Twentynine Palms, California. In attendance were Hospital Corpsman Third Class Petty Officer [HM3] Whiskey, Hospital Corpsman Second Class Petty Officer [HM2] Hotel, HM2 Wilson, Hospital Corpsman First Class Petty Officer [HM1] Davis, Appellant, and the victim, Hospital Corpsman Third Class Petty Officer [HM3] Delta.[4]

After arriving at Appellant's home between approximately 1830 and 1930, the group cooked food, listened to music, smoked cigars, and consumed varying quantities of alcohol. At some point in the evening, Appellant showed HM2 Wilson his new Springfield 9mm pistol. According to HM2 Wilson, Appellant took the pistol from a nearby coffee table, "cleared [the pistol], so removed the magazine, cleared [the] round that was in the chamber. And then, [Appellant] handed [HM2 Wilson] the pistol."[5] HM2 Wilson subsequently placed the magazine and cleared round onto the nearby television stand and proceeded to get "a feel for the sights and the trigger" of the weapon.[6] He then handed the pistol back to Appellant who passed the Springfield 9mm around to the others at the party.

Over the course of the evening, Appellant brought out two additional firearms. Specifically, a Springfield 1911 .45 pistol and a lever action rifle. As the weapons were passed around, there were instances where the Sailors "dry

---

[2] This issue is raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

[3] We have reviewed AOEs 3, 5, 6, and 7, and find them to be without merit. *United States v. Matias,* 25 M.J. 356, 363 (C.M.A. 1987). In doing so, we examined the entire record and are satisfied that the charges and specification of which Appellant was convicted were supported by legally and factually sufficient evidence. Art. 66, UCMJ, 10 U.S.C. §866. *See also United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002).

[4] All names in this opinion, other than those of Appellant, military judge, and counsel, are pseudonyms.

[5] R. at 896

[6] *Id.*

fired" the weapons.[7] Appellant was seen dry firing the Springfield 9mm while pointing it at the victim. He was not alone in doing so, however, as HM3 Whiskey also dry fired the Springfield 9mm while pointing the weapon at the victim.

Eventually, the weapons were put away. The lever action rifle was put behind a recliner, the 1911 .45 was placed between a wall and couch, and the Springfield 9mm was set down under a coffee table. At various times, the group went outside to smoke cigars, cooked food in the kitchen, and ate in the living room. They also began playing a drinking game. The board game, "shaped like [M]onopoly," required players to "drink a certain amount of drinks or do a specific task" after landing on a given square.[8]

As the group conversed and played the game, HM2 Wilson noticed the 9mm magazine and spare round were still on the television stand. After asking HM2 Davis to pass him the magazine and spare round, HM2 Wilson removed each round from the magazine, counted the rounds, reloaded the magazine, and then placed both the magazine and spare round onto a windowsill near him. He did so to prevent someone from loading a round into the Springfield 9mm by accident. Eventually, Appellant asked HM2 Wilson for the rounds and magazine back, stating he intended to put the Springfield 9mm away upstairs. But rather than bringing the rounds and magazine upstairs, Appellant "loaded the magazine into the pistol, charged a round into [the] chamber [by racking the slide], took the magazine out, put the spare round into the magazine" and then placed "the magazine back [into] the pistol."[9] Appellant then put the Springfield 9mm in his waistband.

Sometime thereafter, Appellant began wrestling with the victim. At this point, Appellant gave HM2 Wilson both the handguns. Having seen Appellant load the Springfield 9mm, HM2 Wilson placed the weapon under his thighs while Appellant and the victim wrestled. When the wrestling ended, Appellant asked for the Springfield 9mm back and again put the gun in his waistband.

Around midnight, Appellant and the victim began wrestling again. At some point, Appellant pulled the Springfield 9mm from his waistband and placed it against the victim's head. The victim then "grabbed [the pistol] by the front of the muzzle and, sort of, pulled it in, like, a couple inches to his forehead."[10] Shortly before this, HM2 Hotel had witnessed Appellant pull the slide, causing

---

[7] R. at 897, 1089. "Dry firing" means pulling the trigger of the weapon without a round in the chamber.

[8] R. at 899.

[9] R. at 901.

[10] R. at 902.

a round to enter the firing chamber. Seeing the pistol against the victim's head and believing Appellant, in pulling the slide with a loaded magazine in the weapon, had just put another round in the chamber, HM2 Hotel "tried to jump up and tell him to stop."[11] He was too late. Appellant pulled the trigger, killing the victim.

Appellant asked HM2 Wilson to call for help. As HM2 Wilson did not know Appellant's address, he passed the phone to Appellant, who spoke with the 911 dispatcher. The dispatcher notified the installation's Criminal Investigative Division [CID], who, in turn, notified the Naval Criminal Investigative Service [NCIS]. Agents from both CID and NCIS reported to the scene. Upon their arrival, Appellant told a CID agent that the victim had "reached down into the sofa, pulled out a pistol and put it to his head and shot himself."[12]

Around 0145 on 17 August 2019, HM3 Whiskey, HM2 Hotel, HM2 Wilson, HM1 Davis, and Appellant were placed in a military police van and driven to the local NCIS headquarters. Each Sailor was subsequently interviewed concerning the circumstances of the victim's death. HM1 Davis provided the most details concerning the shooting in his initial interview; he described seeing smoke in the air around Appellant after hearing the shot. He did not, however, describe seeing the shot being fired. Three others, HM3 Whiskey, HM2 Hotel, and HM2 Wilson, also recalled hearing a gunshot, but similarly denied seeing it fired. At the time, none of the witnesses said Appellant shot the victim. Appellant did not provide a statement.

## B. The Investigation and HM3 Whiskey's Confession

Later that day, after NCIS agents had erroneously concluded that the victim was shot in the back of his head, HM3 Whiskey was called to NCIS a second time. (This mistaken conclusion regarding the wound's back-to-front orientation led NCIS agents to wrongly believe the shot was fired from the victim's right—where HM3 Whiskey was sitting.) Shortly after being read his rights under Article 31(b), UCMJ, NCIS Special Agent [SA] Tango confronted HM3 Whiskey, saying he was not providing the full circumstances surrounding the

---

[11] R. at 1018.

[12] R. at 1366.

victim's death.[13] In response, HM3 Whiskey stated, "If I shot him, I don't remember," and went on to note he "never put the magazine inside the gun."[14] In response, SA Tango told HM3 Whiskey that she believed the victim's death may have been an accident, and that HM3 Whiskey had a bright future ahead of him.[15] When SA Tango said that HM3 Whiskey seemed scared, he replied, "I am scared . . . . If I knew I did it, I would say it."[16] Special Agent Tango next told HM3 Whiskey that she believed the bullet that killed the victim was fired from where he was seated.[17] After being confronted with this allegation, HM3 Whiskey continued to assert he did not remember what happened.

A few minutes later, HM3 Whiskey told SA Tango, "[b]ut if like the evidence . . . you can't argue evidence if the evidence and stuff come back and say I [shot the victim] it was an accident."[18] A minute later, he told SA Tango, "I don't know what happened . . . I literally do not know what happened . . . Maybe I just blocked it out . . . I don't know what happened."[19] He then repeated: "If I knew that it was me that did it, I would say that it was me that did it."[20]

In response to further claims that he did not recall what happened, SA Tango again told HM3 Whiskey that the shot that killed the victim was fired from where he was seated. In response, HM3 Whiskey said, "If that's all the evidence [concerning the victim's death], then I guess when I pulled the trigger and it went off, I guess my mind just shut it off, shut it out. Because I never intended for that to happen. It was just a stupid f**king accident."[21] After this

---

[13] Official Video Rec'g of HM3 Whiskey's NCIS Inv'w, App. Ex. XVII at 2, 7:20, 8:05. This rights warning also included a cleansing warning, as agents had failed to advise HM3 Whiskey of his Article 31(b) rights during his previous interviews. While NCIS agents had previously suspected HM2 Whiskey of reckless endangerment, they now suspected him of having killed the victim.

[14] Official Video Rec'g of HM3 Whiskey's NCIS Inv'w, App. Ex. XVII at 2, 9:58; App. Ex. XXXIV at 48.

[15] Official Video Rec'g of HM3 Whiskey's NCIS Inv'w, App. Ex. XVII at 2, 11:57.

[16] *Id.* at 12:37.

[17] *Id.* at 13:15.

[18] *Id.* at 18:25.

[19] *Id.* at 19:35.

[20] *Id.* at 22:10.

[21] *Id.* at 25:45.

statement, SA Tango left the room. When she left, HM3 Whiskey immediately whispered to himself, "It wasn't me."[22]

When SA Tango returned after ten minutes, she continued her questioning. HM3 Whiskey admitted to playing with the gun but told SA Tango he did not know how it became loaded. Then, during the 39th minute of the interview, he stated, "I guess, I guess, I did it. There's really no arguing it. It was a stupid f**king thing. It was a mistake. I didn't mean to do it. I f**king killed somebody."[23]

After HM3 Whiskey confessed, SA Tango asked him a number of follow-on questions, including, "Did you pull the trigger?"[24] to which HM3 Whiskey responded, "I believe so."[25] In response to further pressing, HM3 Whiskey told SA Tango, "I guess after I took a drink—beer, I picked up the gun either from the floor or couch next to me and then I shot him."[26] He then stated, "I guess that makes sense if I did have the gun in my hand."[27]

HM3 Whiskey went on to describe the shooting in further detail, stating, "[w]hen I put down my beer, I picked up the gun, pointed it at him, expecting it to dry fire again, boom, hands went up because it scared the f**k out of me and that's when I saw him slump. That's when I was like holy s**t."[28] At SA Tango's urging, HM3 Whiskey wrote a letter to the victim's parents, stating, "Your son was a good man and I took him from you and this world out of pure stupidity."[29] As a result of this interview, HM3 Whiskey was placed into pretrial confinement the following day.

While HM3 Whiskey was in pretrial confinement, HM1 Davis voluntarily returned to NCIS and told investigators that he saw Appellant holding a gun immediately after hearing the gunshot. HM1 Davis described to investigators that he believed the weapon Appellant was holding was the 1911 .45 pistol. He further said that, from his perspective, only Appellant could have fired the shot that killed the victim. He did mention, however, that it was possible HM3

---

[22] *Id.* at 27:54.

[23] *Id.* at 38:54.

[24] *Id.* at 39:27.

[25] *Id.* at 39:28.

[26] *Id.* at 44:20.

[27] *Id.* at 44.45

[28] *Id.* at 46:10.

[29] App. Ex. XVII at 4.

Whiskey could have fired the shot if the evidence showed the entrance wound was in the back of the victim's head.

An autopsy revealed that the wound to the back of the victim's head was where the bullet exited. The entrance wound was on his forehead.

Approximately twelve days after his interview with SA Tango, HM3 Whiskey recanted his confession. Among the reasons he offered for falsely confessing were "he was scared," he had received only "an hour of sleep," he "wanted the questions to stop," and that SA Tango's mention of the victim's family "made him feel terrible."[30]

Over the course of the investigation, HM2 Hotel and HM2 Wilson were again interviewed by NCIS. In these interviews, both Sailors told NCIS that Appellant was the one who fired the shot that killed the victim. Each recalled Appellant holding a black pistol that looked to be the Springfield 9mm immediately after the shot was fired. Forensic testing confirmed that the bullet that killed the victim was fired from the Springfield 9mm pistol.

When questioned by NCIS about where various persons were located when the shot was fired, HM2 Hotel's, HM2 Wilson's, and HM1 Davis's answers were in agreement. Each described Appellant as being on the victim's immediate right, while HM3 Whiskey was sitting to the victim's left. Ultimately, the forensic report of the shooting indicated the bullet that killed the victim was lodged in the wall immediately to the victim's left.[31]

Three months before trial, Appellant moved for a preliminary ruling to admit the recording of HM3 Whiskey's interview with SA Tango and the handwritten note to the victim's parents. Appellant argued the confession should be admissible under Military Rule of Evidence [Mil. R. Evid.] 807, the residual exception to the rule against hearsay.

In his ruling on the motion, the military judge determined the evidence was inadmissible under Mil. R. Evid. 807 for four specific reasons. First, the "forensic evidence in [the] case directly contradict[ed]" the confession.[32] In fact, the military judge noted that "the only evidence" Appellant addressed regarding

---

[30] App. Ex. XVII at 23.

[31] The Government's expert testified that the trajectory testing (Pros. Ex. 15) could tell only the trajectory of the bullet once it left the victim's head, and not the trajectory of the bullet before striking the victim. R. at 1763, 1766-67. But the evidence indicating that the bullet was lodged in the wall directly to the victim's left supports the military judge's finding that, "[f]orensic evidence determined that it is highly unlikely if not impossible that [Whiskey] shot HM3 [Delta]." Appellate Ex. CLXXXVIII at 3.

[32] App. Ex. CLXXXVIII at 5.

HM3 Whiskey's culpability as the shooter was his confession in the interview.[33] Second, SA Tango utilized "suggestive questioning akin to coaching while questioning [HM3 Whiskey]."[34] Third, the circumstances of SA Tango's interview of HM2 Whiskey "are indicative of unreliability."[35] HM3 Whiskey "was unstable from grief, fear, and lack of sleep."[36] Moreover, HM3 Whiskey "had endured two interrogations in less than twenty-four hours about an event that ended in the bloody death of a friend."[37] The military judge found that HM3 Whiskey, when advised of his rights and accompanied by counsel at his third interview, recanted his confession.[38] The military judge ruled the handwritten note inadmissible under M.R.E. 807 for the same reasons. He then went on to rule in the alternative that admitting HM3 Whiskey's statement "would serve to mislead the members and waste time in violation of [Mil. R. Evid.] 403."[39]

But the confession was not without utility. The military judge ruled that the Defense could impeach HM3 Whiskey with his statement to SA Tango; the Defense simply could not offer the statement for its truth.

At trial, under direct examination by the Government, HM3 Whiskey testified that he had falsely confessed to the shooting: "I admitted to killing HM3 [Delta] which I did not do."[40] He further testified that, while he was present when the victim was killed, he did not see the shot occur. During cross-examination, trial defense counsel elicited from HM3 Whiskey, in detail, all relevant facts regarding his confession to SA Tango.

Prior to closing arguments, the military judge provided the members, *inter alia*, a general instruction regarding the proper consideration of prior inconsistent statements.

## C. The Continuance Motion

On 5 June 2022, three days before the trial was scheduled to begin, Appellant's expert consultant and witness, Mr. Clark, tested positive for COVID-19.

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at 6.

[39] *Id.*

[40] R. at 1184.

As a result, Appellant asked for a ten-day continuance. Appellant argued, citing healthcare guidelines in place at the time, that Mr. Clark would be able to recover and travel to the trial at the conclusion of the ten-day continuance.

The continuance motion was addressed the following day at an Article 39(a), UCMJ, hearing. Appellant's trial defense counsel argued that the "need to present a complete defense" necessitated Mr. Clark being "alert, attentive," and physically able to observe the trial.[41] With the symptoms Mr. Clark was experiencing, trial defense counsel believed he would be unable to do so, absent a continuance.

The Government argued that the "logistical and administrative burden" would shift the trial "indefinitely" if the continuance was granted, as more than thirty individuals were already scheduled to attend the trial and seventeen potential members were awaiting voir dire.[42] Furthermore, Mr. Clark had told the Government he was capable of appearing virtually.

The military judge denied the continuance request, noting Mr. Clark was "not a fact witness" and that it would be "perfectly fine for him to listen in telephonically."[43] Finding Mr. Clark's ability to listen telephonically was "more than sufficient," the military judge stated, "[i]f we have to make any adjustments down the line, I'll consider those."[44]

**D. The Challenge for Actual and Implied Bias**

During voir dire, a prospective member, Gunnery Sergeant [GySgt] Cool, indicated he had heard about the victim's death, having had a conversation with another Marine that may have been prompted by coverage of the incident on social media. He indicated, however, that he could place his "previous exposure" to the incident aside and "focus solely on what is presented in this courtroom."[45] He further stated, "I haven't seen evidence yet, so I have no opinions as of yet."[46]

Trial defense counsel challenged GySgt Cool for actual and implied bias. The military judge denied the challenge on both bases.

---

[41] R. at 476.

[42] R. at 472.

[43] R. at 480.

[44] *Id.*

[45] R. at 716-17.

[46] *Id.*

Additional facts necessary to resolve specific AOEs are discussed below.

## II. DISCUSSION

### A. Appellant's Sixth Amendment right to present a complete defense was not violated.

Appellant argues his Sixth Amendment right to present a complete defense was violated when the military judge excluded the video recording of HM3 Whiskey's second NCIS interview and the letter he wrote to the victim's family. We disagree.

#### 1. Standard of Review and Law

We review a ruling to admit or exclude evidence for an abuse of discretion.[47] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[48] "Findings of act are affirmed unless they are clearly erroneous; conclusions of law are reviewed de novo."[49] It is an abuse of discretion if the military judge (1) "predicates his ruling on findings of fact that are not supported by the evidence . . . ;" (2) "uses incorrect legal principles;" (3) "applies correct legal principles to the facts in a way that is clearly unreasonable," or (4) "fails to consider important facts."[50]

The Supreme Court has held that, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."[51] "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."[52] For example, the right is subject to established evidentiary rules applicable to criminal trials "so long as they

---

[47] *United States v. Solomon,* 72 M.J. 176, 179 (C.A.A.F. 2013); *United States v. Czachorowski,* 66 M.J. 432, 434 (C.A.A.F. 2008).

[48] *United States v. White,* 69 M.J. 236, 239 (C.A.A.F. 2010) (citation and internal quotations omitted).

[49] *Czachorowski,* 66 M.J. at 434 (citations omitted).

[50] *United States v. Commisso,* 76 M.J. 315, 321 (C.A.A.F. 2017) (citations omitted).

[51] *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006) (internal citations and quotation marks omitted).

[52] *United States v. Scheffer,* 523 U.S. 303, 308 (1998) (citations omitted).

are not arbitrary or disproportionate to the purposes they are designed to serve."[53]

A military judge has "considerable discretion in admitting evidence as residual hearsay."[54] But the residual hearsay exception is intended to "be used very rarely and only in exceptional circumstances."[55] It allows for the admission of otherwise excludable hearsay statements, even if not specifically covered by another hearsay exception, provided the following conditions are met:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of the circumstances under which it is made and evidence, if any, corroborating the statement; and (2) the statement is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.[56]

Our superior Court has summarized (and reordered) these threshold requirements as "(1) materiality, (2) necessity, and (3) reliability."[57]

Materiality "is a multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in th[e] case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue."[58]

The necessity prong "may be satisfied where a witness cannot remember or refuses to testify about a material fact and there is no other more probative evidence of that fact."[59] While residual hearsay may be "somewhat cumulative, it may be important in evaluating other evidence and arriving at the truth so

---

[53] *Id.* (citation and internal quotations omitted).

[54] *United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F. 2003) (citation and internal quotations omitted).

[55] *Czachorowski*, 66 M.J. at 435 n.6 (quoting S. Rep. No. 1277 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7051, 7066) (citation omitted).

[56] Mil. R. Evid. 807(a).

[57] *United States v. Kelley*, 45 M.J. 275, 280 (C.A.A.F. 1996) (citations omitted). While this summary was of the previous version of the residual hearsay rule, we find it equally applicable to the current version.

[58] *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (citations and internal quotation marks omitted).

[59] *United States v. Wellington*, 58 M.J. 420, 425 (C.A.A.F. 2003) (citations omitted).

that the 'more probative' requirement cannot be interpreted with cast iron rigidity."[60]

Reliability is determined through the weighing of "particularized guarantees of trustworthiness . . . drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief."[61] These include such factors as the age and mental state of the declarant; the spontaneity and repetition of the statement; the circumstances under which the statement was made; whether suggestive questioning was used; the presence or lack of a motive to fabricate; and whether the statement is corroborated by other evidence.[62]

Whether a constitutional error is harmless beyond a reasonable doubt is a question of law that we reviewed de novo.[63] Constitutional error is harmless if "it appears 'beyond reasonable doubt that the error complained of did not contribute to the verdict obtained.'"[64] For non-constitutional errors, we test for prejudice, considering the following factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[65]

*2. Analysis*

In ruling HM3 Whiskey's confession video and letter inadmissible as substantive evidence, the military judge applied the correct law, but failed to consider all important facts. In his written ruling finding the statements to be untrustworthy, he stated that, "HM3 [Whiskey's] recanted confession is the only evidence Defense has pointed to indicating [HM3 Whiskey] was the shooter" and "[t]he only possible corroborating evidence of [his] statements . . .

---

[60] *Kelley*, 45 M.J. at 280 (quoting *United States v. Shaw*, 824 F.2d 601, 610 (8th Cir. 1987)) (citation omitted).

[61] *Idaho v. Wright*, 497 U.S. 805, 820 (1990).

[62] *Id.* at 821-22 (citations omitted); *Donaldson*, 58 M.J. at 488 (citations omitted); *United States v. McGrath*, 39 M.J. 158, 166-67 (C.M.A. 1994) (citations omitted).

[63] *Arizona v. Fulminante*, 499 U.S. 279, 295-96 (1991) (citations omitted); *United States v. Hall*, 58 M.J. 90, 94 (C.A.A.F. 2003) (citing *United States v. Walker,* 57 M.J. 174, 178 (C.A.A.F. 2002); *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001) (citation omitted).

[64] *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[65] *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999) (citation omitted).

is the note he wrote to HM3 [Delta's] parents."[66] The clear implication is that the military judge did not consider any of the purportedly corroborative evidence cited by the Defense: (1) HM3 Whiskey was in the room when the shooting occurred; (2) HM3 Whiskey had earlier expressed some animosity regarding the victim; (3) in the hours before the shooting, HM3 Whiskey had pointed and dry-fired the pistol in the victim's direction; (4) HM3 Whiskey's dinner plate, which HM3 Whiskey says he set down just prior to the shooting, was on the coffee table next to where the forensic evidence indicates the shot originated; and (5) forensic evidence showed that HM3 Whiskey was in contact with, or in close proximity to, a discharging firearm that night and that expected-but-absent blood spatter could indicate HM3 Whiskey was not sitting where he said he was at the time of the shooting.

While the record is clear that these facts were of relatively weak character and overwhelmingly outweighed by the evidence supporting Appellant's guilt, they were still facts the military judge should have considered in his analysis. But, had the military judge considered them, we are convinced his ruling would not have changed. The circumstances under which the statements were made—evidenced by the recording of the questioning by SA Tango—firmly convince us of the statements' untrustworthiness. Even considering the arguably corroborative evidence Appellant cites, we reach the same conclusion as the military judge: HM3 Whiskey's admission was a "false confession"[67] and, therefore, inadmissible under the residual hearsay exception.

Were this simply a question of whether the military judge abused his discretion in not admitting evidence, our analysis of this AOE would end here. But Appellant couches the issue as one of constitutional import. Claiming the military judge's ruling was a denial of his Sixth Amendment right to present a complete defense, Appellant argues the Government must show any error was harmless beyond a reasonable doubt. We disagree with his premise.

Appellant could, and did, present a complete defense at trial, i.e., that it was HM3 Whiskey, not Appellant, who shot the victim. Nothing prevented trial defense counsel from presenting the same evidence cited above as corroboration of HM3 Whiskey's confession. During cross-examination of HM3 Whiskey, trial defense counsel: confronted HM3 Whiskey regarding contradictory statements describing his location on the couch; explored HM3 Whiskey's negative comments regarding the victim; showed that HM3 Whiskey had previously admitted to joking around with the Springfield 9mm and dry firing it at

---

[66] App. Ex. CLXXXVIII at 5, 6.

[67] App. Ex. CLXXXVIII at 3.

the victim that night; and established the location of HM3 Whiskey's dinner plate in relation to the victim's place on the couch.

Through the cross and direct examinations of expert witnesses, trial defense counsel offered, and the military judge admitted, evidence that the shot could have originated from where HM3 Whiskey was sitting. The Defense also elicited expert testimony regarding gunshot residue and blood spatter that indicated that HM3 Whiskey may have fired the shot.

Most importantly, trial defense counsel was able to attack HM3 Whiskey's testimony that it was Appellant, not himself, who fired the shot. The Defense did so by establishing, in great detail over 13 transcribed pages of cross-examination, that HM3 Whiskey had earlier confessed to shooting the victim.[68]

Additionally, to counter testimony inculpating their client, trial defense counsel were able to impeach the other witnesses' testimony by eliciting admissions that each had been drinking the night of the shooting and that, when initially questioned, all denied seeing what happened or claimed that the victim had shot himself.

It is clear, then, that the military judge's exclusion of the recording of HM3 Whiskey's statements to NCIS did not prevent Appellant presenting a complete defense. *His counsel simply was precluded from using false hearsay statements to do it.* We conclude this does not equate to a violation of a constitutional right, but rather a reasonable restriction on that right. "[A] defendant, who is otherwise permitted to present his defense, is [not] denied constitutional due process of law because certain evidence—the fundamental trustworthiness of which is wholly unestablished by the defendant—is excluded from the trial."[69]

Finally, even were we to find the military judge abused his discretion in not admitting the video and letter as substantive evidence under Mil.R.Evid. 807, he was correct in ruling the evidence inadmissible under Mil.R.Evid. 403. We agree that admitting the recording of HM3 Whiskey's interview and his letter would be a needless waste of time. We also believe it would constitute the needless presentation of cumulative evidence. First, the interview with SA Tango lasted nearly four hours and was only one of several interviews of HM3 Whiskey by NCIS. Admitting the one recording would necessarily open the door to admitting the others, as well as the potential for expert testimony regarding false confessions. Second, the Defense was able, mainly through cross-examining HM3 Whiskey, to establish that HM3 had confessed to killing the

---

[68] R. at 1266-1278.

[69] *United States v. Burks*, 36 M.J. 447, 451 (C.M.A. 1993) (citation omitted).

victim. The recording and letter add nothing to the evidence admitted on this issue. Thus, while a third-party confession is certainly relevant, the probative value of the recording and letter is substantially outweighed by these considerations.

Accordingly, we find this AOE to be without merit.

## B. The military judge did not err in denying the challenge for implied bias against GySgt Cool.

### 1. Standard of Review and Law

"Whether a prospective juror 'is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the prospective juror's state of mind.'"[70] "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province."[71] "It is plainly a question of historical fact; did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."[72] "[T]he trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'"[73]

Courts generally recognize two forms of bias that subject a panel member to a challenge for cause: actual bias and implied bias.[74] "Actual bias is defined as 'bias in fact.'"[75] It is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."[76] "Actual bias is personal bias which will not yield to the military judge's instructions and the

---

[70] *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)) (internal punctuation omitted).

[71] *Witt,* 469 U.S. at 428.

[72] *Hennis*, 79 M.J. at 384 (internal citation and quotation omitted).

[73] *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citation omitted); *see United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (granting great deference to the military judge's ruling on challenges for cause).

[74] *United States v. Wood*, 299 U.S. 123, 133 (1936).

[75] *United States v. Woods*, 74 M.J. 238, 245 (C.A.A.F. 2015) (Stucky, J., concurring) (quoting *Wood*, 299 U.S. at 133).

[76] *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (internal quotation marks omitted) (citation omitted).

evidence presented at trial."[77] We review actual bias-based challenges for an abuse of discretion.[78]

A military judge's resolution of challenges founded in implied bias receive slightly less deference. While we generally give a "military judge's ruling on a challenge for cause . . . great deference,"[79] we review rulings on challenges for implied bias "under a standard less deferential than abuse of discretion but more deferential than de novo."[80] This standard recognizes that implied bias deals with the public's objective perception of the fairness of the military justice system, and not simply the military judge's assessment of whether a challenged member can serve in a fair and impartial manner.[81] "[W]e evaluate implied bias objectively, through the eyes of the public, reviewing the perception or appearance of fairness of the military justice system."[82]

We will give greater deference where a military judge puts on the record his analysis and basis for denying a defense challenge for cause and indicates that he considered the liberal grant mandate.[83] "Although it is not required for a military judge to place his or her implied bias analysis on the record, doing so is highly favored and warrants increased deference from appellate courts."[84] This is because it provides a "vantage point of a military judge observing members in person and asking the critical questions that might fill any implied bias gaps left by counsel."[85] However, a mere "[i]ncantation of the legal test [for implied bias] without analysis is rarely sufficient in a close case."[86] We "afford a military judge less deference if an analysis of the implied bias challenge on

---

[77] *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citing *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A. 1987)).

[78] *Id.* at 88-89 (citation omitted).

[79] *United States v. Rolle*, 53 M.J. 187, 191 (C.A.A.F. 2000) (citations and internal quotation marks omitted).

[80] *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002) (citations omitted).

[81] *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008).

[82] *United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008) (citations and internal quotation marks omitted).

[83] *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

[84] *Dockery*, 76 M.J. at 96 (citation omitted).

[85] *Clay*, 64 M.J. at 277.

[86] *Unites States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015).

the record is not provided."[87] In applying this standard, we look to the totality of the circumstances.[88]

"The test [for implied bias] takes into account, among other distinct military factors, the confidence appellate courts have that military members will be able to follow the instructions of military judges and thus, while it will often be possible to 'rehabilitate' a member on a possible question of actual bias, questions regarding the appearance of fairness may nonetheless remain."[89] The issue, then, is whether the risk that the public will think the accused received anything less than a fair trial is "too high."[90]

Further, the liberal grant mandate requires the military judge to err on the side of granting a defense challenge.[91] That is, "if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted."[92] This serves as a logical preventive measure because "it is at the preliminary stage of the proceedings that questions involving member selection are relatively easy to rapidly address and remedy."[93]

### 2. Analysis

We note that, although Defense challenged GySgt Cool for both actual and implied bias, the only issue Appellant raises on appeal is implied bias. We note, too, that the reasons Appellant cites on appeal differ slightly from those raised at trial. Regardless, considering all bases raised at both trial and on appeal, we find no error.

While the military judge provided his rationale for finding GySgt Cool had no actual bias, he conducted no implied bias analysis on the record. His only reference to implied bias was to say he found GySgt Cool to be "a fair and im-

---

[87] *Id.* (citation omitted).

[88] *Nash*, 71 M.J. at 88.

[89] *Woods*, 74 M.J. at 243.

[90] *Id.* at 243-44 (citing *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *Townsend*, 65 M.J. at 463).

[91] *Peters*, 74 M.J. at 34 (citing *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998)).

[92] *Id.*

[93] *Id.* (citing *Clay*, 64 M.J. at 277).

partial member, even considering implied bias and the liberal grant mandate."[94] Accordingly, we give little deference to the military judge's ruling on the implied bias challenge.

Appellant first claims the public could question GySgt Cool's ability to be fair and impartial because he had likely already reached a judgment as to what occurred. As proof, Appellant says GySgt Cool "used this case online as a 'teaching moment' for how not to behave," "used those facts as a 'teaching moment' with his Marines," and, when thinking about this case, was prompted "to use it as a teaching moment for his Marines regarding their weapons handling safety."[95] This may cause us concern but for the fact these statements are completely unsupported by the record.

During individual voir dire, GySgt Cool recalled reading several years prior "that there was a corpsman that was shot and that there might possibly be some issues with the circumstances that went down with it. And that's pretty much as far as I know."[96] He recalled discussing the case with his master sergeant. Their discussion "naturally progressed" to speaking about weapons safety, as both are combat instructors.[97] When asked by trial defense counsel if he was "thinking of this as a teaching moment for [him]self and [his] Marines," GySgt Cool agreed. He summarized the discussion as "a staff sergeant and a master sergeant talking about guns and gun safety," saying weapons safety rules are "just something innate in our nature to discuss and talk about."[98] He stated that the weapons safety discussion was prompted by the case but that they only "[t]alked about it in an overarching manner."[99] This is a far cry from "us[ing] those facts as a 'teaching moment' with his Marines."

Appellant next points to GySgt Cool's "innate in our nature" comment and his statement that he was "losing [his] mind" thinking about the weapons training his Marines were then conducting in the field.[100] Appellant cites this as evidence of GySgt Cool's "pronounced and distinct familiarity" with weapons

---

[94] R. at 798.

[95] Appellant's Br. at 4, 16-17, 48-49.

[96] R. at 715-16. At trial, the Defense argued that, since GySgt Cool may have seen something about this case on social media, he may have been exposed to posts created by the victim's family. But here is no evidence in the record to support this speculation.

[97] R. at 722.

[98] R. at 723.

[99] R. at 724.

[100] R. at 723.

safety, arguing that this could raise questions regarding his ability to be objective in this case.[101] We disagree, as following this logic would lead us to absurd results. Given the critical importance of weapons safety in the Marine Corps, we would need to conclude the public could reasonably question *any* Marine's ability to be fair and impartial in any court-martial involving allegations of unsafe weapons handling. We decline to do so.

Appellant also argues that GySgt Cool's recent discussion of the case could raise concerns over his ability to be fair and impartial. Here, too, we disagree. When notified that he and four other senior members of his unit would be potential members at Appellant's trial, he discussed the court-martial with his executive officer, but only regarding the impact the absence of their unit's leadership would have on the mission. The facts of the case "didn't really come up."[102]

We find none of these matters, individually or collectively, would lead the public to reasonably question the perceived fairness of military justice or the proceedings in this case with GySgt Cool sitting as a member. This is not a close case; the liberal grant mandate is not in play. Accordingly, we hold that the military judge did not err in denying the Defense's challenge to GySgt Cool.

## C. The military judge did not abuse his discretion by denying the Defense's continuance request.

Appellant argues the military judge erroneously denied trial defense counsel's continuance request when Appellant's expert consultant contracted COVID-19 before trial. We disagree here, as well.

### 1. Standard of Review and Law

"A military's judge's decision to grant or deny a continuance must be tested for an abuse of discretion . . . ."[103] Military judges abuse their discretion when their reasons for denial are "clearly untenable" and "deprive a party of a substantial right such as to amount to a denial of justice."[104]

---

[101] Appellant's Br. at 50.

[102] R. at 719.

[103] *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997) (citation omitted).

[104] *Id.* (citation and internal quotations omitted).

Article 40, UCMJ, authorizes a military judge to grant a continuance "for as long and as often as is just."[105] To determine whether a military judge abused his or her discretion in denying a continuance request, we consider the following factors listed by the Court of Appeals for the Armed Forces [C.A.A.F.] in *United States v. Miller*:

> surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice.[106]

Appellate courts need not decide if a military judge abused his or her discretion denying a continuance where an appellant fails to establish prejudice.[107]

*2. Analysis*

We begin and end our present analysis with the question of prejudice. Appellant claims no actual prejudice and we find none. Yet Appellant asks us to disregard this, as the *Miller* test's penultimate factor regarding denial of a continuance requires only the *possibility* of an impact on the verdict. We are unpersuaded.

The test the military judge applied was the correct one. Not being clairvoyant, it was proper for the military judge, when weighing whether to grant a continuance, to consider whether there was the possibility of prejudice. But, in evaluating whether the military judge's denial of the continuance was prejudicial error, we have the benefit of hindsight, i.e., the record before us.

The military judge left open the door to reconsider his ruling if the arrangement he imposed proved unworkable or inadequate. He advised counsel to "keep the Court apprised of what [Mr. Clark's] status is. If we have to make any adjustments down the line, I'll consider those."[108] Yet, other than the initial motion and the related hearing regarding the continuance request, trial defense counsel was silent on the issue throughout the trial.

---

[105] *United States v. Parker*, 75 M.J. 603, 613 (N-M Ct. Crim. App. 2016) (quoting R.C.M. 906(b)(1), Discussion).

[106] *Miller*, 47 M.J. at 358 (internal citation omitted).

[107] *Wellington*, 58 M.J. at 425.

[108] R. at 480.

The record clearly shows that Mr. Clark participated telephonically during the entire two-day presentation of the Government's case. And he was present and testified in person during the Defense's case. Neither trial defense counsel nor Mr. Clark claimed that the arrangement impaired the latter's ability to evaluate Government testimony or other evidence, to effectively consult with trial defense counsel, or to provide expert testimony on Appellant's behalf. Throughout the trial, there was no indication that the military judge's solution to the problem was in fact inadequate or in any way prejudiced Appellant. And Appellant offers no such evidence on appeal.

We note that, in applying the now-eponymous factors in *Miller*, the C.A.A.F. discussed evidence in the record of both possible and actual prejudice:

> Where a military judge denies a continuance request made for the purpose of obtaining civilian counsel, prejudice to the accused is likely. Certainly in this case, where defense counsel had so little time to prepare, it would be difficult to find harmless error. During oral argument before this Court, [civilian counsel] articulated a number of actions he would have taken at the post-trial hearing if the continuance had been granted and he had represented Miller at the post-trial hearing. Considering those reasonable actions which were not taken and the on-the-record admission that detailed defense counsel was unprepared for the post-trial hearing, we conclude that Miller was prejudiced.[109]

Given the substantially different issue and facts before us—denial of a continuance to allow an expert witness to attend all parts of the trial in-person—we encounter no such difficulty in finding harmless error. And, given the complete absence of any evidence of how denial of the continuance actually affected the trial, we find no prejudice. Accordingly, we find this AOE without merit.

### III. CONCLUSION

After careful consideration of the record and the briefs, as well as the excellent arguments of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[110]

However, we note that the Entry of Judgment does not accurately reflect the disposition of the charges in that in summary description of the offenses do

---

[109] *Miller*, 47 M.J. at 359.

[110] Articles 59 & 66, UCMJ.

not include the dates of the offenses.[111] Although we find no prejudice, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[112] In accordance with Rule for Courts-Martial 1111(c)(2), we modify the Entry of Judgment and direct that it be included in the record.

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[111] *United States v. Wadaa,* __ M.J. __, No. 202300273, 2024 CCA LEXIS 148 (N-M. Ct. Crim. App. Apr. 25, 2024).

[112] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

# United States Navy–Marine Corps Court of Criminal Appeals

| | |
|---|---|
| **UNITED STATES** | NMCCA NO. 202300228 |
| v. | **ENTRY OF JUDGMENT** |
| **Edmond A. MAEBANE III**<br>Hospital Corpsmen<br>Second Class (E-5)<br>United States Navy<br>*Accused* | *As Modified on Appeal*<br><br>**3 May 2024** |

On 8 June 2022, the Accused was tried at Marine Corps Base Camp Pendleton, California, by a general court-martial, consisting of officer and enlisted members. Military Judge Stephen F. Keane.

## FINDINGS

The following are the Accused's pleas and the Court's findings to all offenses the convening authority referred to trial:

**Charge I:** **Violation of Article 119, Uniform Code of Military Justice, 10 U.S.C. § 919.**

> *Plea:* Not Guilty.
> *Finding:* Guilty.

**Specification:** **Involuntary Manslaughter on or about 16 August 2019.**

> *Plea:* Not Guilty.
> *Finding:* Guilty.

**Additional Charge I:** **Violation of Article 114, Uniform Code of Military Justice, 10 U.S.C. § 914.**

> *Plea:* Not Guilty.
> *Finding:* Guilty.

**Specification:** **Reckless Endangerment, handling a loaded firearm after consuming alcohol, on or about 16 August 2019.**

*Plea:* Not Guilty.
*Finding:* Guilty.

# SENTENCE

On 16 June 2022, a panel of officer and enlisted members sentenced the Accused to the following:

**A dishonorable discharge.**

**Reduction in grade to E-1.**

**Total forfeitures of all pay and allowances.**

**Confinement for a total of six (6) years.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court